EDWARD C. CROW, Attorney-General, ex rel. AL-
LEN B. JONES, JAMES LOVE, ALEXANDER
B. CRAWFORD, ABRAM T. LITCHFIELD and
TRIGG T. ALLEN, Appellant, v. CLAY COUN-
TY, as Trustee of the "Aull School Fund," et al.

### Division Two, May 22, 1906.

1. **CHARITY: Gift to County: For Education.** A gift to a county
of money to be loaned on real estate of ample value and free
from all incumbrances, and at the highest legal interest, and
to be continued at interest perpetually, the interest accruing
thereon to be applied under the direction of the county court,
to pay the tuition or education of orphans or poor children un-
der the age of sixteen years at and within two miles of the
county seat, created a charity.

2. **———: Perpetual Trust: Administration of ·Fund: Necessary
Parties.** Such a gift created a perpetual trust in the county, and
in no event can the fund revert to the donor's heirs, nor are
they necessary parties in a suit by the Attorney-General, at the
relation of citizens of the county, to have said limitation as to
age removed, and to have said interest used for children of any
age, and for their education, not only in the public schools, but
in colleges and technical institutes.

3. **———: ———: Administration: Cy Pres Doctrine.** The *cy
pres* doctrine as applied in England is often inapplicable to the
administration of charities in this country. The courts of the
United States do not exercise the prerogative power over char-
ities which is exercised by the English court of chancery. Our
equity courts have authority to make changes in the details of
administering charity, but not to change the dominant purpose
of the donor.

4. **———: Gift for Education: Public Schools: Mutation: Removal
of ·Limitations.** The donor by will in 1842 gave money to a
county in perpetual trust, the income thereof to be used, under
the direction of the county court, in educating orphans and poor
children under sixteen years of age, at and within two miles of
the county seat, and the county court turned over to the school
board of the public school district the income, to be used in the
employment and payment of teachers, and the money thus re-
ceived, when added to the fund obtained from taxation, etc.,
enabled the school board to maintain a nine months' public
school each year, and also a high school. *Held*, that there have

been no such mutations in time and in the conditions and requirements of education, brought about by the development of the public school system since the charity was created, as prevents the beneficent and charitable intention of the donor from being carried out in the method adopted by the court, or as to authorize a removal of the limitation as to sixteen years of age so as to permit children of any age to share in the benefits of the fund, or as authorizes the court to use the fund in educating children in colleges and high technical institutes.

5. ———: ———: ———: ———: ———: **Benefit of Rich.** It is no valid objection to the use of the income of such trust fund for the support of the public school, that it incidentally will have the effect of lessening the burden of taxation upon the rich.

6. ———: **For Educational Purposes: Allowable Administration: Meaning of Trust Clause in this Case.** The donor gave $1,000 to the county in 1842 in perpetual trust, the income thereof to be used, under the direction of the county court, to pay the tuition or education of orphan or poor children under the age of sixteen years, at or within two miles of the county seat. *Held,* first, that the dominant intention of the bequest was to give an elementary education to the greatest practicable number of poor children under sixteen years of age within the territory designated according to its boundaries at the date of testator's death; *second,* testator's heirs have no interest in said fund or in any suit seeking a decree directing its administration; *third,* the public school system has not supplanted said trust, but the same remains in force, and should be executed, but, as to details, with due regard for changed conditions; *fourth,* said trust should not be modified either as to age limit or territorial limit; *fifth,* that the county court, in executing said trust, may pay the tuition of beneficiaries contemplated by said charity at private schools located within two miles of the county seat (courthouse) where they live within the bounds of said territory, whether within or without the public school district which embraces the county seat town, or may co-operate with said public school district in the employment and payment of teachers, either in graded or high school, as long as nine months' school is annually maintained both as to graded and high school work, and so long as poor children under sixteen years of age living within two miles of the county seat, whether they live within or without said public school district, are admitted to said public school free of tuition; and may make an appropriation out of said fund to pay for school books for poor children who, otherwise, will be denied school privileges; and, *sixth,* a decree so directing does not require the county court to delegate its trust, but to call to its aid the public school system, to the end that better results may be secured.

Appeal from Clay Circuit Court.—*Hon. J. W. Alexander*, Judge.

AFFIRMED.

*Herbert S. Hadley*, Attorney-General, for appellant; *D. C. Allen* of counsel.

(1) The area of the action and benefit of the Aull Fund is at and within the territory of the city of Liberty as fixed by section 1, article 1, of the Act of February 27, 1851 (Laws 1851, p. 98)—one square mile—and within two miles of the territory embraced in the city of Liberty. The area of the action and benefit comprises 21.56 square miles. It will be observed that the testator uses the term "county seat," and does not menton the town Liberty. Why was this? It is a historic fact that county seat removal has been mooted in times past in Clay county. The testator was a man of sense and knew that Liberty would grow from, perhaps, 500 inhabitants in 1838, to 3,000 inhabitants now. These and other considerations, doubtless, induced the testator to say county-seat. The Clay county court, by statutory authority on May 7, 1829, incorporated Liberty as a town with territory consisting of the northeast quarter of section 7, township 51, range 31. The Legislature, on February 27, 1851, by the direct exercise of legislative power, incorporated Liberty into a city and gave it a territory of one ·square mile. Will anyone have the hardihood to contend that the northeast quarter of section 7 is the county seat of Clay county? The term of the will is county-seat, and, as a legal consequence, it must be true that the area of the action of the Aull Fund would increase with the legal territorial increase of the county-seat. McIntyre's Admrs. v. Zanesville, 17 Ohio St. 352. (2)   As to who may be trustees: Perry on Trusts (5 Ed.), sec. 39; Hill on Trustees (4 Am. Ed.), p. 48; 1 Lewin on Trusts (1 Am. Ed.), p. 30;

Tudor's Charitable Trusts (3 Ed.), 67, 97, 177. On the question of doubt as to power of a county court to act as trustee or to perform any function other than those specifically conferred on it by statute: Howard v. Tracy, 118 Mo. 631. And as showing the extent of the chancellor's powers—even to changing the trustee, etc. —and, inferentially, the greater scope and power of the Legislature: Women's Christian Ass'n v. Kansas City, 147 Mo. 103. (3) In their answers, respondents say: Said school district "is now and always has been a country school district with three directors, and is not and never has been, a city or village school district." They also say: Said school district "has voluntarily but continuously maintained a high school and done high school work." Article 1 of chapter 154, Revised Statutes 1899, is the charter of the school district. If the power has not been granted by that article to the school district to establish and maintain a high school, independently and without union with three or more other school districts, then it has not now—and has never had—the power to do so. The most minute scrutiny of that article will fail to show that it has such power, acting alone. But to make it yet plainer, apply the well-known maxim —*expressio unius est exclusio alterius.* Broom's Legal Maxims (3 Am. Ed.), p. 505. Section 9773 in article 1 expresses the mode and terms of establishing and maintaining a high school by union of a district with "any other three or more school districts in Missouri." (4) The answers to the information are drawn on a misconception of the extent and meaning of the case of Sappington v. School Fund Trustees, 123 Mo. 32. That case is not in point in this case. To understand both cases, it is first necessary to consider the change of conditions in Missouri between May 22, 1838—the date of John Aull's will—and October 24, 1853, the date of the trust deed by Dr. John Sappington. (5) It is palpable from the record that for above twenty years prior

to the filing of the information herein, the trustee of the Aull fund had committed continuous breaches of the trust by delegating, without any warrant in law, all of its duties in the administration of the trust to the school district. It turned over the $8,500 to the district and did no more. It is a fixed, universal principle of law that the office of trustee is one of personal confidence, and its duties cannot be delegated unless an express authority for that purpose be conferred by the instrument creating the trust. Hill on Trustees (4 Am. Ed.), 179; Perry on Trusts (5 Ed.), secs. 287 and 408; Underhill on Trusts, 292; 1 Lewin on Trusts (1 Am. Ed.), p. 252; Pomeroy's Equity Jurisprudence (2 Ed.), sec. 1068; Graham v. King, 50 Mo. 22; Sales v. Perry, 51 Mo. 449; Harper v. Mansfield, 58 Mo. 17; Vail v. Jacobs, 62 Mo. 130; Brickenkamp v. Rees, 69 Mo. 426; Spurlock v. Sproule, 72 Mo. 503; St. Louis v. Priest, 88 Mo. 612.  (6)  It is *ultra vires* of the school district to receive trust moneys of a charity and apply it, as in this case, growing out of the receipt by the school district of moneys from the Aull Fund, and the application of it as indicated in the record. What is the meaning of *ultra vires?* In this case it simply means: It was outside of, beyond the powers for which the school district was created by the Constitution and laws of Missouri, for it to receive moneys from the Aull Fund and attempt to execute the trust established by John Aull. Reese's Ultra Vires, sec. 17; Green's Brice's Ultra Vires, 36. The school district is a corporation established by law for a specific educational purpose, indicated and limited in its charter; and not to ascertain what children are orphans or poor, nor to hold the title to trust funds, nor to execute any trust but its own. Art. 1, ch. 154, R. S. 1899.  (7) The charity created by John Aull in his will for "orphan or poor children at or within two miles of the county-seat of Clay county," is a charity of the clearest and most unimpeachable character, by all the au-

thorities. Statutes of England (Folio 1640), p. 1233; Perry on Trusts (5 Ed.), ch. 23. It is, also, a public trust, because it is a charitable trust. The expressions public trust and charitable trust are synonymous. Tudor's Charitable Trusts (3 Ed.), pp. 2 and 11. In the settlement made by John Aull there is an expressed charitable intention, and the sum bequeathed is directed to be perpetually kept at interest. From this it follows, as a necessity, that the direction includes the perpetual application of interest accrued to the payment of the tuition of orphan or poor children. There is, therefore, no resulting trust in the fund. Hill on Trustees (4 Am. Ed.), pp. 128, 450; Perry on Trusts (5 Ed.), secs. 156, 723, 726; 1 Lewin on Trusts (1 Am. Ed.), p. 161. (8) In Missouri the doctrine of *cy-pres* (as a necessary factor in the administration and effectuation of charities), has been recognized as existing in our law, in the same sense and as broadly as in England. And whatever the force and effect of the term *cy-pres* as molded and left by Lord Chancellor HARDWICKE, the same is its force and effect in Missouri. Chambers v. St. Louis, 29 Mo. 543; Acad., etc., v. Clemens, 50 Mo. 167; Goode v. McPherson, 51 Mo. 126; Mo. Hist. Soc. v. Acad. of Science, 94 Mo. 459; Lackland v. Walker, 151 Mo. 210; Atty.-Gen. v. Whitchurch, 3 Vesey, Jr. 141; Atty.-Gen. v. Boultbee, 2 Vesey, Jr. 380; Atty.-Gen. v. Stepney, 10 Vesey, Jr. 22; Atty.-Gen. v. Whiteley, 11 Vesey, Jr. 241; Atty.-Gen. v. Bishop of L., 2 My. & K. 586; Atty.-Gen. v. Mayer, Etc., 3 Bro. C. C. 171; Moggridge v. Thackwell, 7 Vesey, Jr. 36; Bishop of H. v. Adams, 7 Vesey, Jr. 324; Spiller v. Maude, R. L. 32 Ch. Div. 158; Atty.-Gen. v. Hicks, 3 Bro. C. C. 166; Atty.-Gen. v. Glyn, 12 Sim. Ch. 84; Green's Brice's Ultra Vires (Am. Ed.), 447; Pomeroy's Eq. Juris. (2 Ed.), 1027; Bishham's Prin. of Eq., sec. 126; Snell's Prin. of Eq. (Am. Notes), 111; Story's Equity (4 Ed.), sec. 1169; Tudor's Charitable Trusts (3 Ed.), *passim.* (9) A charity for the benefit of the poor—orphans and

poor children—without more, must be applied to the sole and exclusive benefit of the beneficiaries named in the instrument creating it, and to the benefit of no one else whatever. The public—the taxable property of the public—can receive no part of the benefit, directly or indirectly, and all uses of it which may or do have the effect of relieving taxation are illegal and void. This principle goes so far that it cannot be intended that the poor inhabitants of a parish who receive parochial relief—through taxation—can receive aid from charities created for the poor inhabitants of the same parish.' It must go to the poor inhabitants who do not receive alms. Otherwise the rich would be as much relieved— perhaps more, as in this case—out of the charity, as the poor. Hence, the appropriations by the county court out of the Aull Fund for the benefit of the school district were breaches of the trust and palpable misappropriations. Atty.-Gen. v. Clarke, Ambler, 422; Pomeroy's Eq. Juris. (2 Ed.), p. 1514; 2 Perry on Trusts (5 Ed.), sec. 698; Hill on Trustees, p. 453; Willard's Equity, 581;Tudor's Charitable Trusts (3 Ed.), 863; 1 Jarman on Wills (5 Ed.), 210; Atty.-Gen. v. Wilkerson, 1 Beav. 370; Atty.-Gen. v. Brandeth, 1 Y. & C. 200; In re Prison Charities, L. R. 16 Eq. Cas. 109; McIntyre's Admrs. v. Zanesville, 17 Oh. St. 352; Plymouth v. Jackson, 15 Pa. St. 44; Atty.-Gen. v. Coopers' Co., 19 Vesey, Jr. 187; Man v. Ballet, 1 Vernon 42; Waller v. Childs, Ambler, 524; Atty.-Gen. v. Hudson, 1 P. Will. 674; Tudor's Charitable Trusts (3 Ed.), 104, 105, 106 and 160, note a. (10) A charity given to a particular purpose—as long as the purpose remains—must be adhered to and executed. It cannot be diverted to any other purpose. It must be accepted and retained on the terms given. Hence, the appropriations by the county court to the school district were diversions and breaches of the trust. St. John's Coll. Cam. v. Plott, Finch's Rep. 222; Atty.-Gen. v. Profs. in Cam., 1 Vernon, 55; Atty.-Gen. v. Whiteley, 11 Vesey, Jr. 241;

Clark v. Maguire, 16 Mo. 302; McRoberts v. Moudy, 19 Mo. App. 26; Underhill on Trusts, 220; Pomeroy's Eq. Juris. (2 Ed.), 1062 and 1070; 2 Story's Equity, sec. 1175; Plymouth v. Jackson, 15 Pa. St. 44; Man v. Ballet, 1 Vernon, 42. (11) Where a charity cannot, in all respects, be executed as directed, but the general purpose is distinct, and may be, in real substance, attained by another mode, then, in such case, the purpose of the testator must be executed upon the doctrine of *cy-pres*. If the general substantial intention of the will is charity, the failure of the particular mode will not defeat it; the law will substitute another mode. Atty.-Gen. v. Whitchurch, 3 Vesey, Jr. 141; Atty.-Gen. v. Bowyer, 3 Vesey, Jr. 714; Atty.-Gen. v. Whiteley, 11 Vesey, Jr. 241; Atty.-Gen. v. Cooper's Co., 19 Vesey, Jr. 187; Moggridge v. Thackwell, 7 Vesey, Jr. 36; Barkley v. Bonnelly, 112 Mo. 561; Women's Chris. Ass'n v. Kansas City, 147 Mo. 103; Lackland v. Walker, 151 Mo. 210; Perry on Trusts (5 Ed.), sec. 717; Hill on Trustees (4 Am. Ed.), 462; Lewin on Trusts (1 Am. Ed.), pp. 837 and 838; Tudor's Charitable Trusts (3d Ed.), 143. (12) The question here is not one of simple expediency, but of actual necessity. In fact, there are two necessities. They are: 1. The chancellor should interfere, and, by a suitable decree and scheme, divorce the trust and trustee *a vinculo* from the school district. This is a necessity not only to save the charity, but morally and legally, to preserve faith with the honored dead. 2. It is a necessity not only to prevent the trust from idle accumulation but to save it from criminal waste. (13) It is submitted that the removal of the age limitation of sixteen years from the beneficiaries of the Aull Fund and the application of the annual interest to paying the tuition fees of as many of them as the annual interest can, in college, university or high technical institute, with provision for the progressive increase of the fund, as indicated in the information and the scheme

196 Sup.—16

submitted for the administration of the fund, will, un-
der the existing conditions and as far as we can now
see, come nearest the intention of John Aull—be of the
largest and most lasting benefit to the beneficiaries and
the State—will best conserve the fund—and will meet
the approval of the ablest thinkers and scholars in the
country. (14) What was the dominant thought in the
mind of John Aull? The betterment of orphans and
poor children. How? By the payment of their tuition
at school. The payment of their tuition, then, was the
means, not the end. Near a quarter of a century after
his death, the State intervened—took upon itself the ed-
ucation of its youth between the ages of six and twenty
—and for near forty years past has educated—and now
educates,—all of the orphan and poor children contem-
plated by the charity, more thoroughly and fully than
it can now or ever could be done through the agency of
the charity. What is to be done? The trust must be
executed in a way that will be to the betterment of the
orphan and poor children and consistent with the chari-
table intention. John Aull was a sensible man and
wished that his charitable intent be perpetually exe-
cuted in a way that would be to the betterment of the or-
phan and poor children. If he could have forecasted the
future, can any sensible man believe that he would have
wished that his fund—his cherished fund—should be
wasted in attempting to do that which the State—
through taxation—is doing better for the objects of his
bounty?

*Frank H. Trimble* and *James M. Sandusky* for re-
spondents.

(1)    The will of John Aull created a charitable
trust. Mo. His. Soc. v. Academy of Science, 94 Mo. 459;
Sappington v. School Fund Trustees, 123 Mo. 32; Lack-
land v. Walker, 151 Mo. 210; Jackson v. Phillips, 14
Allen, 591. (2)    The heirs of John Aull are not neces-

sary parties. Lackland v. Walker, 151 Mo. 242; Good
v. McPherson, 51 Mo. 127. (3) Under the facts al-
leged in the answers, and admitted by the demurrers,
the public school system has not supplanted this trust.
Sappington v. School Fund Trustees, 123 Mo. 32; Green
v. Blackwell, 35 Atl. 375; In re John's Will, 47 Pac. 341;
Adams Female Academy v. Adams, 65 N. H. 225; In re
Strong's Appeal, 37 Atl. 395. (4) The dominant pur-
pose of John Aull's will was to give an elementary edu-
cation to poor children, under sixteen years of age,
within two miles of the city of Liberty. Under the facts
the court cannot deviate from this dominant purpose.
Lackland v. Walker, 151 Mo. 210; 151 Mass.375. (5)
The decree of the court below contains this order: "7.
That said trustee formulate rules for the administra-
tion and disbursement of said fund, and for giving no-
tice to those who are the beneficiaries thereof, and re-
port the same to this court for approval at its next
term." The decree in this case from which the appeal
was taken was interlocutory; the appeal was premature
and should be dismissed. (6) The county court of
Clay county did not delegate its trust. It acted in co-
operation with school district No. 2, and merely availed
itself, under changed conditions, of opportunities for
securing better results. (7) The statute does not
prescribe a curriculum for the public school. The local
board of directors of district No. 2 adopted a very com-
plete course, and the school regularly did high school
work, though not having a technical high school. Its
course embraced seven years of grade work and four
years of high school work.

FOX, J.—This cause is here upon appeal from a
decree of the Clay Circuit Court in respect to the admin-
istration and management of a trust fund provided for
by the last will and testament of John Aull, deceased.
We have carefully considered the entire record in this
cause and find that this case, as well as the contention

of the respective parties, is fully and fairly stated in the opinion of the trial court. In fact, the crucial question with which this court is confronted is the correctness or incorrectness of the decree rendered which is predicated upon the conclusions of law announced by the trial judge in his opinion.

If the opinion as rendered by Judge ALEXANDER is a correct announcement of the legal propositions involved in this proceeding, or if his conclusions upon the case stated are correct, then this decree of the trial court should be affirmed; otherwise, it should be reversed. As the opinion fully and fairly states this controversy and discusses about all of the vital legal propositions presented, we here reproduce it in full. It is as follows:

"This is a proceeding by information by the Attorney-General of Missouri, at the relation of Allen B. Jones, James Love, Alexander B. Crawford, Abram T. Litchfield and Trigg T. Allen, against Clay County, as trustee of the Aull School Fund, and the heirs of John Aull, deceased, naming them.

"The information alleges, among other things, that on the 24th day of January, 1842, John Aull, late of Lafayette county, Missouri, departed this life, having made a will, which was duly admitted to probate before the county court of said Lafayette county, in vacation, said county court having probate jurisdiction, on the 22d day of February, 1842. That the executors thereupon duly qualified and entered upon the discharge of their duties, and afterwards, at the June term of said county court, 1842, the action of said clerk in vacation in relation to the probate of said will was duly confirmed by said court.

"That on the 3d day of March, 1846, said executors filed a certified copy of said will in the office of the circuit clerk and ex-officio recorder of deeds of said Clay county, and the same is duly recorded in Book 1 at page 167. That said John Aull, in said will, bequeathed to

defendant Clay county, by the name and description of the county court of Clay county, the sum of one thousand dollars, to be loaned on real estate security of ample value, and free from all encumbrances, and at the highest legal interest, and to be continued at interest perpetually, and the interest accruing thereon to be applied under the direction of the county court of said Clay county, to pay the tuition or education of orphans or poor children under the age of sixteen years, at or within two miles of the county-seat of said Clay county.

"That at the date of the execution of said will, as well as at the time of the death of said John Aull, and the probate of said will, the town of Liberty was the county seat of said Clay county, with certain limits or boundaries in said petition alleged, and that said town, by virtue of an act of the General Assembly of Missouri, approved February 27, 1851, entitled, 'An Act to incorporate the City of Liberty,' was incorporated as a city with territorial limits described in said act as follows, to-wit: 'All that district of country contained within one square mile, of which the court house of Clay county in the town of Liberty is the center, the sides of said square being respectively parallel to the corresponding sides of said court house,'' and that said district, one mile square, embraces the whole of the territory of the town (now city of Liberty), and that said city of Liberty is now, and has been since February 27, 1851, the county seat of Clay county, with the terminal limits aforesaid.

"That by virtue of an act of the General Assembly of Missouri, approved February 25, 1845, entitled, 'An act to authorize the county court of Clay, Ray, Jackson and Lafayette counties to execute certain trusts,' the said Clay county (by and through the county court thereof) was authorized and empowered to receive said bequest of one thousand dollars, and execute said trust, said bequest being designated in said act as the 'Aull School Fund,' — a name and description by which said

fund has ever since been known. That on the 29th day of July, 1845, said bequest was paid to the county treasurer of said Clay county; and that since said last-named date the county court has managed, controlled and loaned said fund on behalf of said Clay county. That said original bequest has been preserved intact, and has been allowed to accumulate until same now amounts to about the sum of $14,350, and made copy of the items set out particularly in the petition.

"It is further alleged in the information, that since the date of said will, and the death of said John Aull, a vast revolution has occurred in Clay county, as well as throughout the entire State of Missouri, in matters relating to the tuition and education of the youth—a matter which has not and could not have been anticipated by said John Aull—summarized as follows:

"That at said time the county of Clay, as well as the State of Missouri, were wholly without an effective public school system, and that the public funds available for school purposes were inadequate to support schools in the area of the operation of said fund— the schools being sustained largely by voluntary contributions, or tuitions, paid by parents, the result being that the children of the poor often remained uneducated, and that said bequest was made to supply in a measure such need. That by virtue of article IX of the Constitution of 1865, and the acts of the General Assembly entitled, 'An act to provide for reorganization, supervision and maintenance of common schools,' approved March 29, 1865, and, 'An act authorizing any city, town, or village to organize for school purposes with special privileges,' approved March 15, 1866, and an act entitled, 'An Act supplementary to and explanatory of an act entitled, "'An Act authorizing any city, town or village to organize for school purposes, with special privileges,"' approved March 19, 1866, enforcing said article IX, the State of Missouri abandoned the old, voluntary system of education and adopted and put in opera-

tion the system of free public schools for the education
of her youth, supported by taxation, which system has
ever since been in force in this State, including Clay
county, and that a portion of the territory embraced in
the operation of said fund, of said Clay county, includ-
ing the city of Liberty, was pursuant to an act ap-
proved March 15, 1866, organized into a public school
district, known as District No. 2, Township No. 51, of
Range No. 31. That said district still exists, and embra-
ces about eight and one sixth square miles, and that the
territory covered by the scope of said trust embraces an
area of about twenty-one and fifty-six one-hundredths
square miles.

"That the effect of the adoption by the State of the
free public school system within the area comprised
within the action of the charity of said John Aull were
these:

"1. The free public schools, by reason of their in-
comes from the school fund and taxation, have been at
all times able to furnish to the orphan, or poor children
under the age of sixteen years, education superior to
what could have been furnished by the income of said
fund.

"2. For the trustee to have maintained schools
and employed teachers would have been a criminal
waste of the said fund.

"3. That by reason of the premises said fund be-
came, and is useless, for the purpose of the tuition or
education, of the orphans or poor children under the
age of sixteen years, as contemplated by the charity;
but that whatever the value of the tuition or education
afforded by the public schools in the area of the action
of said charity, it does not and cannot meet the de-
mands for higher education in matters classical, liter-
ary, artistic, scientific and technical, which it is alleged
can only be met by the colleges, universities and insti-
tutes of technical art.

"That the trustee, against the intent of the testa-

tor, has at various times appropriated out of said fund, and paid to the said public school district No. 2, sums aggregating $8,500 and over, which were applied by the latter to its several public uses. That such appropriation and payment was contrary to law and for no charitable use whatever.

"That although said trustee has been in possession of said fund for fifty-six years, yet, aside from the few general directions contained in said will in reference to the administration of said fund, it has not by its own act, so far as it may act by law, nor by application to this court, created or sought to create any definite or comprehensive scheme, or any scheme whatever, for the uniform, safe and certain administration of said fund, nor sought to have defined the meaning of the words 'orphan' and 'poor children,' as used in said will.

"That during this last twenty-eight years said trustee, aside from paying necessary costs and charges incurred in the administration of said fund, has not made any appropriation whatever out of said fund within the meaning of said will, nor for paying the tuition or education of the orphan or poor children, within the area of the action of said fund, and that said trustee proposes to make other and further appropriations out of said fund to said school district No. 2 and in aid of a public library in said city of Liberty.

"Said information concludes with a prayer to this court for an order judgment and decree as follows:

"1. For the removal of said limitation of sixteen years in the application of the income of said charity for the benefit of orphan and poor children, so that such orphans and poor children after they shall have completed the course of education in the public schools, may have the same applied to their tuition and education in colleges, universities and high technical institutes, if desired by them and they are found worthy, and that the removal of said limitations will execute the charitable intent of said John Aull, as near as possible.

"2. That said original fund of one thousand dollars, and all unused accumulations thereof, not being uncollectible interest, be held as one charity, and such accumulations go along with the original fund, and be administered accordingly.

"3. That a scheme be formulated for the future administration of the said charity.

"On proper application, the county court of Clay county and School District No. 2, Township 51, of Range 31, were made parties defendant, and separate answers and returns were filed on their behalf, also on behalf of Clay county. The answers in all material parts are identical, and admit the allegations of the information relating to the origin and creation of the Aull School Fund, to be true as therein alleged; and that at the date of the execution of said will and at the date of the death of said testator, the town of Liberty was the county seat of Clay county, and has continued to be the county seat thereof, and that said town, now city, was incorporated, first by an order of the county court of Clay county on the 7th day of May, 1829, and afterwards by an act of the General Assembly of the State of Missouri on the 27th day of February, 1851, in manner and form and with the boundaries as stated in said information, and that no changes in said boundaries have been made since said 27th day of February, 1851. That by the act of the said General Assembly, approved February 25, 1845, the county court of Clay county was authorized to receive, administer and execute said trust under said will so far as same pertained to Clay county. That the heirs of John Aull are as stated in the said information, and that said trust fund so created by said John Aull, and received by said county court, is known and designated as the "Aull School Fund," and was so designated by the act of the General Assembly approved February 25, 1845.

"But defendants deny that there has been any misemployments, negligence, misconversions or omis-

sions, against the intent of the said testator, by said trustee in the execution of said trust, or that said trustee meditates or further proposes to make any payments or appropriations out of said fund contrary to law, or contrary to the intent of said testator, either in aid of a public library, or for any other purposes inconsistent with the testator's intentions as expressed in said will, and denies that the mutations of time and the changes in the conditions and requirements of education require the removal of the limitations in said will restricting the benefits of said fund to orphans and poor children under sixteen years of age, or that the adherence to such limitations will defeat the testator's beneficent and charitable intention, or leave said trust fund in idle accumulation, and further answering the defendants allege the following facts, to-wit:

"(a)   That on the 13th day of June, 1836, a public school district was organized under the laws of the State of Missouri, embracing the said town of Liberty and certain territory adjacent thereto, known as the Liberty School District. The boundaries were as follows, to-wit: 'All that part of township 51, range 31, included within the following boundary, to-wit: Beginning at the northwest corner of section 6, of township 51, range 31, running south with the range line 2.5 miles, thence east three miles, thence north 2.5 miles to the township line, thence west with said line 3 miles to the beginning.'

"(b)   Afterwards, under and pursuant to the laws of the State of Missouri, on the—— day of ———, 186—, the city of Liberty as then incorporated, together with certain adjacent territory, was organized into a school district by the corporate name of School District No. 2 of Township 51, Range 31, County of Clay, State of Missouri,' and said district has remained as thus organized until the present time, except that it has been enlarged from time to time, until its present boundaries are as follows: Beginning at the northeast

corner of section 4, township 51, range 31, thence south 2.5 miles to the quarter section corner on the east side of section 16, in said township and range, thence west 1.5 miles to the center of section 17, in said township and range, thence continuing west one-quarter of a mile on the east-and-west center line of said section 17, thence south one-twelfth of a mile, thence west one-twelfth of a mile, thence in a southeasterly direction to the center of the southwest quarter of said section 17, thence west to the west line of said section 17, thence . north to the quarter section corner on the west of said section 17, thence west one-quarter of a mile, thence north one-quarter of a mile to the quarter section corner on the north of section 18 in said township and range, thence west to the northwest corner of said section 18, thence south to the quarter section corner on the east of section 13, in township 51, range 31, thence west one-quarter of a mile to the southwest corner of the east half of the northeast quarter of section 13, thence north to the north line of said section 13, thence east to the northeast corner of said section 13, thence north two miles to the southeast corner of section 36, township 52, range 32, thence north one-quarter of a mile, thence west one-quarter of a mile to the southwest corner of the northeast quarter of the southeast quarter of said section 36, thence north one-quarter of a mile to the east and west subdivisional line running through the center of said section 36, thence east one-quarter of a mile to the quarter section corner on the east of said section 36, thence east one-half mile to the center of section 31, township 52, range 31, thence north one-half mile to the north line of section 31 aforesaid, thence east to the northeast corner of section 31, thence south to the quarter corner on the east side of said section 31, thence west to the center of said section 31, thence south to the quarter section corner on the south of said section 31, thence east three-fourths of a mile to the southwest corner of the east half of the southwest

quarter of section 32, township 52, range 31, thence north to the east and west center line of said section 32, thence east a half mile to the northeast corner of the west half of the southeast quarter of said section 32, thence south to the south line of said section 32, thence east one-sixth of a mile, thence in a slightly northwesterly direction three-eighths of a mile, thence east one-quarter of a mile, thence southwestwardly about three-eighths of a mile, thence southwestwardly to the southeast corner of the west half of the southwest quarter of section 33, township 52, range 31, thence east to the northeast corner of said section 4, township 51, range 31, the point of beginning, containing an area of 8.31 square miles. Said district No. 2, township 51, range 31, county of Clay, and State of Missouri, is now and always has been, a country school district, with three directors, and is not, and never has been a city or village school district.

"(c) That said testator by his said will, in providing a fund to pay the tuition or education of orphan or poor children, under the age of sixteen years, at or within two miles of the county seat of Clay county, created a charitable trust, for the purpose named, with the county court of Clay county as trustee; and that said county court of Clay county, pursuant to said act of the General Assembly of the State of Missouri, approved February 25, 1845, has acted as trustee from said date until the present time.

"(d) That the county court of Clay county, Missouri, has not at any time invoked the chancellor's aid in the interpretation of said will for the reason that it seemed plain that the term 'orphan' as used in said will was synonymous with the word 'poor' and should be interpreted as if said will read 'orphan,' that is to say, 'poor children,' and that the territory embraced by said trust was all territory within two miles of the county seat of Clay county, as said county seat was

organized at the time said will took effect in January, 1842.

"(e)　That the territory embraced by said trust, under such a construction of said will, comprises an area of 16.82 square miles, instead of 21.56 square miles as alleged in said information, and that within said territory of 16.82 square miles, covered by said trust, there is a large territory outside of school district No. 2 as aforesaid, having an area of 8.51 square miles.

"(f)　That the dominant purpose of said testator in the creation of said charitable trust was:

"First, to furnish the opportunity for an elementary education, at the locality named, to poor children, during the early period of youth when the child's mind and body are unable and unfit to engage in the practical things of life, so that when he should arrive at the age of sixteen years, and should be impelled by his condition to labor for a living, he would be able to do so with an elementary education; and

"Secondly, that by said limitation in years, that the many and not the few should receive the benefit of said charity.

"(g)　That there is now a large number of orphan or poor children under sixteen years of age residing within the territory embraced by said trust; and while the county court of Clay county, in the administration of said charitable trust, could have paid the tuition of certain of said poor children at private schools which are now, and for many years have been, located at said county seat, and could now do so, yet on account of the large number of such children and the price of tuition, such action upon the part of said court would have consumed the accumulations of such fund within a few years, and would thereafter have restricted the benefits thereof to two or three children; that said trustee could have hired or built a room, and employed a teacher to teach such children the elementary branches and could do so now; and that said trustee, in the adminis-

tration of said trust, could have used the interest upon said fund annually, and could now do so, in paying for the tuition and education of poor children, under sixteen years of age, residing within the area embraced by said trust but without said District No. 2.

"(h)   That the necessity and availability of said trust fund, for the dominant purpose intended by said testator, still exists, and has not been supplanted by the public school system of the State of Missouri for reasons following, to-wit:

"The maximum limit on the rate of taxation in said school district No. 2, under the Constitution of the State of Missouri, is 65 cents on the $100 assessed valuation.

"The rate levied in said district for the year 1897 was 65 cents on the $100 assessed valuation, and for each of the years of 1898, 1899, 1900 and 1901, the rate was 60 cents on the $100 assessed valuation.

"The enumeration of white children of school age in said district 2, for the year 1897 was 880; the enrollment in school for said year was 530; the average attendance for the said year was 400. The enumeration, enrollment and attendance of colored children for the year 1897 are not given for the reason that the data is not accessible.

"For the years 1898, 1899, 1900 and 1901, the enumeration, enrollment and average attendance of children of school age, white and black, in said district, were as follows:

For the year 1898:
  The enumeration was ............................1005
  The enrollment was ............................ 671
  The average attendance was ..............506

For the year 1899:
  The enumeration was ......................985
  The enrollment was ........................670
  The average daily attendance was ........——

For the year 1900:

    The enumeration was ................ ......... 1200

    The enrollment was .....................708

    The average daily attendance was ........ 515

For the year 1901:

    The enumeration was ...................... .............864

    The enrollment was                         640

    The average daily attendance was ........ 502

"The assessed valuation in said district:

    For the year 1897 was .............. $1,173,355

    For the year 1898 was ............ 1,176,705

    For the year 1899 was .............. 1,085,030

    For the year 1900 was .............. 881,431

    For the year 1901 was ............... 1,031,757

"The enumeration of white school children of school age in said district for the year 1897, exceeded the enrollment by 350 pupils, and exceeded the average daily attendance by 400 pupils; for the year 1898, exceeded the enrollment by 334 pupils and exceeded the average daily attendance by 499 pupils; for the year 1899, exceeded the enrollment by 315 pupils and exceeded the average daily attendance by —— pupils; for the year 1900, exceeded the enrollment by 492 pupils, and exceeded the average daily attendance by 685 pupils; for the year 1901, exceeded the enrollment by 224 pupils, and exceeded the average daily attendance by 362 pupils.

"Should all the children of school age in said district No. 2 attend the public school in said district, the maximum levy of 65 cents on the $100 assessed valuation, permitted by the State Constitution, together with the moneys from public funds accruing to said district would defray but little more than half the expenses of nine months school per annum in said district.

"(i) That the maintenance of a public school in said district, beyond six months in the year, is optional with said district and the maintenance of a high school in said district is optional with said district.

"(j)   That said trust can be more economically and efficiently executed in accordance with the dominant spirit and intent of said will in education of poor children under the age of sixteen years, within the territory prescribed by said will by the county court acting in concert with the directors of said school district No. 2 aforesaid, than in any other manner.   Impressed with this conviction, the county court during the twenty years past, has, from time to time, made appropriations from said 'Aull School Fund' in favor of said district No. 2; and said district has voluntarily maintained a nine months school, and has voluntarily but continuously maintained a high school and done high school work.

"By such concerted action said trust fund can be used to pay the tuition of poor children, under sixteen years of age, within the territorial area of said trust, but outside of said district No. 2, which number is more than sufficient to consume annually the current interest on said fund, and said children may be enrolled to receive the advantages of a high school, which they do not receive in the school district in which they reside, and the dominant spirit and intent of said testator can be effectuated in giving an elementary education to poor children under sixteen years of age, and to the greatest number practicable under any scheme, and the said district is also better enabled to equip and maintain a high school, which is voluntary, and to maintain a nine months' school, which is voluntary, the advantages of all which will accrue to all poor children under 16 years of age within the area of said trust, either within or without said district No. 2; and better results can be obtained by reason of the fact that said district No. 2 has seven grades in its graded school and four in its high school, so that each child may be placed in said school according to his or her proper grade.

"(k)   That the county court of Clay county, through its judges, has at all times had, in fact and under the law, the administration of said trust, and

said district No. 2 has a direct and vital interest in said trust, and in any scheme that may be formulated in relation thereto, and in having all facts pertaining to said trust brought before the court.

"Wherefore, these defendants pray the court to adjudge:

"1. That there is not, and has not been, at any time, any controversy as to the meaning of the will, nor any demand for the construction thereof.

"2. That said trust is a valid charitable trust for the benefit of orphans, that is, poor children under sixteen years of age, within two miles of the county seat of Clay county, as said county seat was organized at said testator's death.

"3. That the dominant spirit and intent of said charity was to give an elementary education to the greatest practicable number of poor children under sixteen years of age at the locality named.

"4. That said trust cannot, under the facts, be remoulded either as to the age limit, or as to the locality of the operation of said trust.

"5. That the public school system of the State of Missouri, neither under the law nor under the facts, has supplanted said trust.

"6. That the dominant spirit and intent of said charity may be effectuated by the county court acting in connection with the School District No. 2, Township 51, Range 31, Clay county, at Liberty, Missouri, and in connection with private schools at said county seat.

"7. That if the use of said trust fund in connection with said district No. 2 be not a literal execution of said trust, it is the nearest approach to the dominant intent thereof that can be made.

"8. That no inflexible rules be formulated for the administration of said trust, but that a liberal discretion be allowed said county in said administration of said trust according to the varying exigencies that may

196 Sup.—17

be expected to arise in dealing with a multitude of poor children under 16 years of age.

"9. That the information herein is devoid of merit or equity, and the same be dismissed.

"And said defendants pray the court for such other and further decree as may be equitable and proper.

"Plaintiffs demurred to, that portion of the answers and returns, beginning with the words: 'And said defendants deny each and every allegation in said information contained, which is not herein specifically admitted,' and the concluding clause of the prayer of said answer and return which is thus worded: 'And said defendants pray for such other and further decree as may be equitable and proper,' for the following reasons, to-wit:

"1. Because said portion of said answer and return does not state facts sufficient to constitute a defense to the information, nor to entitle said defendants to the relief prayed in said answer and return nor any part thereof.

"2. Because such answer and return is wholly insufficient in law.

"3. Because said district No. 2 in township 51 of range 31 in Clay county, Missouri, nor the directors thereof, in whose interest and behalf the said Clay county and the said county court and the judges thereof allege and plead, have no legal right to appear herein, nor to ask the relief prayed by them.

"4. Because said answer and return admits misappropriations of said 'Aull School Fund' by the trustee thereof, in that it admits that the trustee of said fund 'during a period of twenty years past, has from time to time, made appropriations from said 'Aull School Fund' in favor of said district No. 2.'

"5. Because the trustee of said fund unites with said district No. 2 and the directors thereof in urging a continuance of such misappropriations.

"6. Because the effect of such misappropriations

and continuance thereof in the future would be to destroy the character of said 'Aull School Fund' as a charity and to convert the same in effect into a public school fund.

"7.    Because the allegations in such portion of said answer and return are inconsistent.

"8.    Because said trustee had no warrant in law whatever for the making of such appropriations to said district No. 2.

"9.    Because said portion of said answer is wholly without equity.

"10.    Because the allegation of said portion of said answer and return make it evident that it is necessary for the Honorable Circuit Court to intervene in the matter of the administration of said fund.

"The court overruled the demurrer.    The answer is sworn to and the facts stated therein stand admitted under the pleadings, as counsel for plaintiff elected to stand on his demurrer, and declined to file reply to the new matter set out in the answer.

"It is conceded by all the parties to this controversy that the provisions made in the will of John Aull deceased, for the tuition or education of poor children under sixteen years of age, creates a charity.    Indeed the authorities leave no room to doubt this.

"The Supreme Court of Massachusetts in the case of Jackson v. Phillips, 14 Allen 555-6, uses this language: 'A precise and complete definition of a legal charity is hardly to be found in the books.    The one most commonly used in modern cases, originating in the judgment of Sir William GRANT, confirmed by that of Lord ELDON, in Morice v. Bishop of Durham, 9 Ves. 405, and 10 Ves. 541, that those purposes are considered charitable which are enumerated in the St. of 43 Eliz. or which by analogy are deemed within its spirit and intendment—leaves something to be desired in point of certainty, and suggests no principle.    Mr. Binney in his great argument in the Girard Will Case, 41, de-

fined a charitable or pious gift to be "whatever is given for the love of God, or for the love of your neighbor, in the catholic or universal sense—given from these motives and to these ends—free from stain or taint of every consideration that is personal, private or selfish." . . . . A more concise and practical rule is that of Lord CAMDEN, adopted by Chancellor KENT, by Lord LYNDHURST, and by the Supreme Court of the United States: "A gift to the general public use, which extends to the poor as well as the rich." [Jones v. Williams, Amb. 652; Coggeshall v. Pelton, 7 Johns. Ch. 294; Mitford v. Reynolds, 1 Phil. Ch. 191, 192; Perin v. Carey, 24 How. 506.] And then proceeds to formulate the following comprehensive rule: 'A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds and hearts under the influence of education or religion, by relieving the bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.'

"In Hinkley's Estate, 58 Cal. 457, the Supreme Court of California defines charity as follows: 'In order that there may be a good trust for a charitable use, there must be some public benefit open to an indefinite and vague number; the persons to be benefited must be uncertain and indefinite, until they are selected or appointed to be the particular beneficiaries of the trust for the time being.'

"And the Supreme Court in the case of Missouri Historical Society v. Academy of Science, 94 Mo. 459, defines a charity to be: 'Any gift not inconsistent with existing laws, which is promotive of science, or tends to the education, enlightenment, benefit or amelioration of the condition of mankind, or the diffusion of useful knowledge, or is for the public convenience.'

Crow ex rel. v. Clay County.

"The support and maintenance of free schools, and the education and preferment of orphans, came within the express terms of the Stat. 43 Eliz. c. 4, often called the Statute of Charitable Uses, passed in 1601, and this statute was early recognized as part of the common law in this State. [Chambers v. St. Louis, 29 Mo. 543.]

"As will be observed, charitable trusts are highly favored, and a liberal construction will be adopted in order to render them effectual. [5 Am. and Eng. Ency. Law (2 Ed.), 909.]

"The trust created by the will of John Aull, deceased, is perpetual, and in no event can revert to his heirs; nor are they necessary parties to this suit. [Lackland v. Walker, 151 Mo. 242; Women's Christian Association v. Kansas City, 147 Mo. 103; Goode v. McPherson, 51 Mo. 126.]

"The main contention of plaintiff, is, however, that by reason of the mutations of time and the changes in the conditions and requirements of education, largely brought about by the development of the public school system in Missouri, the beneficent and charitable intention of the testator, John Aull, cannot be carried out and executed by a rigid adherence to the benefits of the charity created by him to orphans and poor children under the age of sixteen years, and that this court should, by its judgment and decree, remove said limitation in the application of the income of said charity, for the benefit of orphans and poor children, so that after they shall have completed the courses of study in the public schools, the same may be applied to their tuition and education in colleges, universities and high technical institutes, should said orphans desire higher education.

"On the other hand, defendants insist that the dominant spirit and intent of said charity was to give an elementary education to the greatest practical number of poor children under sixteen years of age, at the locality named; that said charity cannot under the facts

be remoulded, either as to the age limit, or as to the locality of the operation of said trust. That the public school system of the State of Missouri, neither under the laws nor under the facts, has supplanted said trust; and that the dominant spirit and intent of said charity may be effectuated by the county court, acting in conjunction with School District No. 2, Township 51, Range 31, at Liberty, and in connection with the private schools at said county seat.

"Counsel have furnished the court an admirable and comprehensive scheme for the administration of said charity following the lines of their several contentions as above stated. Both invoke the doctrine of *cy pres,* which is peculiar to charitable trusts and may be stated generally as follows: 'Where an apparent charitable intention has failed, whether by incomplete disposition at the outset, or by subsequent inadequacy of the original object, effect will be given to it by a *cy pres* or approximation of application notwithstanding that, in ordinary cases, the trust would be void for uncertainty, or would revert to the donor or his representatives.' [Adams, Equity, 69.]

"Much confusion has arisen however from the use of the term *cy pres* in the books to describe two distinct powers exercised by the English chancellor in charity cases, the one under the sign manual of the crown, the other under the general jurisdiction of equity. [Jackson v. Phillips, 14 Allen (Mass.) 647.]

"As the courts of the United States do not exercise the prerogative power over charities which is exercised by the English Court of Chancery, it is of the utmost importance, in discussing the English cases upon the subject, to bear in mind this ambiguous use of them. Thus in England, when bequests are given to particular uses, charitable in their nature, but illegal as for a form of religion not tolerated by law, the crown may appropriate the fund to other charitable uses under the sign manual, or where there are gifts to charity, gener-

ally, with no trust interposed, no uses specified, and either no provision made for an appointment or the power of appointment delegated to particular persons who die without exercising it, the disposal of the funds is held to be in the crown by sign manual. [5 Am. and Eng. Ency. Law (2 Ed.), 936, and cases cited in notes.]

"Justice GRAY, in the case of Jackson v. Phillips, supra, discussing the powers of the court of chancery in the exercise of its equitable jurisdiction in administering charities, uses the following language: 'A charity, being a trust in the support of the execution of which the whole public is concerned, and which is therefore allowed by the law to be perpetual, deserves and often requires the exercise of a larger discretion by the court of chancery than a mere private trust; for without a large discretionary power, in carrying out the general intent of the donor, to vary the details of administration, and even the mode of application, many charities would fail by the change of circumstances and the happening of contingencies which no human foresight could provide against; and the probabilities of such failure would increase with the lapse of time and the remoteness of the heirs from the original donor who had in a clear and lawful manner manifested his will to divest his estate from his heirs for the benefit of public charities. It is accordingly well settled by decisions of the highest authority that when a bequest is made to trustees for a charitable purpose, the general nature of which is pointed out, and which is lawful and valid at the time of the death of the testator, and no intention is expressed to limit it in a particular institution or mode of application, and afterwards, either by change of circumstances the scheme of the testator becomes impracticable, or by change of law becomes illegal, the fund, having once vested in the charity, does not go to the heirs at law as a resulting trust, but is to be applied by the court of chancery, in the exercise of its jurisdiction in equity, as near the testator's partic-

ular directions as possible, to carry out his general charitable intent.' As regards the extent of discretion which the court has in directing his scheme for charity, Sir John ROMILLY, M. R., in Philpott v. St. George's Hospital, 27 Beav. 107, remarks that some confusion has arisen from the fact that the court has an unlimited power and discretion, or nearly so in some cases in which it makes a scheme, but in other cases it does not. 'The distinction consists in this: If the testator has, by his will, pointed out clearly what he intends to be done, and his directions are not contrary to law, this court is bound to carry that instruction into effect, and has no right and is not at liberty to speculate on whether it would have been more expedient or beneficial to the community that a different mode of application of the funds in charity should have occurred to the mind of the testator, or that he should have directed some different scheme for carrying his charitable intentions into effect.' But he declares that where the disposition is in the crown by sign manual, or where there are accretions to a charity not specifically disposed of or where a fund is given for a special or particular object which entirely fails, the court 'may regulate the application of the funds consistent with the law of the country and views of the Attorney-General.'

"A certain charitable trust declared in favor of poor prisoners in the city of London, having lapsed by reason of absolution of imprisonment for debt, the Attorney-General proposed a scheme by which the funds should be applied to a school for the children of prisoners. It was held that the donor had in mind to relieve prisoners for debt, especially poor and sickly prisoners, and in all cases adults, and that he did not intend to relieve children, or to assist education, and consequently the proposal did not approach sufficiently near to the donor's charitable intention to admit of the funds being applied, *cy pres,* in the manner proposed. [In re Prison Charities, L. R. 16 Eq. 129.] The court does

not execute a charitable trust in a manner different from that intended, unless it cannot be executed literally. But it may be executed in substance by another mode consistent with the general intent. Thus where the object was to build a church in the parish of A, and the parish would not permit it, the trust could not be executed anywhere else. [Attorney-General v. Boultbee, 3 Ves. Jr. 220.]

"The case of Lackland v. Walker, 151 Mo. 210, reviews the authorities at length on the question of charitable trusts and the power of the court of chancery or equity to make changes in the details of administration, but not to change the dominant purpose of the donor. In this case Henry Shaw gave a tract of land in the suburbs of St. Louis to establish the Missouri Botanical Garden, and provided for sixty years leases for building purposes with covenants for perpetual renewal. The city of St. Louis was built up around the premises and was opening streets through them, but the trustees could not dispose of any property on sixty years leases. A suit was instituted, therefore, to obtain a decree authorizing the trustee to convey in fee instead of leases for sixty years, with covenants for perpetual renewal. The court makes a clear distinction between changes in details of administration and changes in the dominant intent of the testator. At page 268 the court says: 'Self-evidently, a sale should not be ordered unless it will be to the advantage of the charity to do so. On the other hand, the mere fact that such an advantage will accrue is not, of itself, sufficient to authorize that to be alienated which the donor has expressly, or impliedly, declared shall remain inalienable. The proviso engrafted by the law upon such a discretion is, that in the case of present or impending impossibility or necessity, the court of chancery, proceeding with due caution and considering the interests or requirements of the charity, may modify and mold the express provision so as to preserve or render pos-

sible of accomplishment the dominant purpose disclosed; but there is no just principle which confers a permission to do so at the mere discretion of the court, or upon the sole ground that it appears to be advantageous to the charity. The question .is not one of expediency, but of an existing exigency.' [Carey Library v. Bliss (1890), 151 Mass. 364-375.]

"In Sappington v. School Fund Trustees, 123 Mo. 32, the facts are these: Dr. John Sappington in 1856 gave $20,000 in trust to be kept on interest perpetually by the aforesaid trustees and the interest accruing thereon to be annually expended by them, in the education of the most necessitous poor children,' in the county of Saline. The deed contains this further proviso: 'In the event that at any time hereafter the common school fund, and other educational funds which may be provided by the State, or which may come into possession of the State from any sources whatever, for the purpose of education, shall become sufficient to educate all the poor children of said county, then and in that case, the said board of trustees are hereby authorized and requested to apply the interest of said fund to such other objects of charity in said county as in their judgment may be most needy, but in no case nor for any purpose is any part of the principal of the said fund to be used or diminished.' The suit was by the heirs of Dr. Sappington who claimed that the charity had lapsed, and that they were entitled to the fund for the reason that the public school funds were sufficient for the education of the poor children of the county and further that the ulterior bequest was void for uncertainty. The court found that the evidence showed the average length of schools in the county to be less than seven months in the year, and that the seating capacity of all the schools was 8,020, while the total enumeration of children of school age in said county was 10,640, and therefore said: 'Clearly, then, the "event" designated by Dr. Sappington had not occurred; the school fund

had not "become sufficient to educate all the poor children in said county." ' And the judgment was therefore for the defendants.

"The case of Green v. Blackwell (N. J.), 35 Atl. 375, is as follows: 'The will of Abigail Moore, who died in March, 1833, provided as follows: "To that incorporated body, 'The Pennington Academy,' and their successors, I give and bequeath $5,000, to make a fund and establishment for all the poor children in that district forever. I will and direct that institution and their successors to put the said sum out on interest, secured by mortgage on landed estate worth double the sum loaned, without buildings, and the interest arising to be appropriated with economy toward the education of the poor children of the district, in reading, writing, arithmetic, grammar, and geography; and, if there are any savings, the same to be put out in like manner, and for the above purpose, forever." The bill then goes on to state that Mrs. Moore's executor paid to the trustees of Pennington Academy the sum of $5,000; and that subsequent to this payment there was opened in that district of the township of Hopewell, wherein the village of Pennington was situated, a certain school, under and by virtue of the law of the State of New Jersey, which school was always thereafter supported by the public moneys raised for that purpose; and that, upon its organization, the Pennington Academy was, in the words of the bill, "abandoned, neglected, and ceased to have any existence in fact." The bill then alleges that the fund so left by Mrs. Moore was diverted from the objects and purposes mentioned in her will, a part of it having been loaned to the trustees of the public school of Pennington and a part to one Fitzpatrick; and that upon the "abandonment" of Pennington Academy and the "diversion of the fund," the complainants became entitled thereto as next of kin. It appears to me plain that, assuming that the academy was abandoned and the fund diverted in the manner men-

tioned, it does not follow that it became the property of the complainants. That the bequest constituted a good charitable trust at the time of the death of the testatrix is not denied. Indeed, it would be hard to frame a gift to charity, less open to question. The purpose of the trust was charitable, and there was a trustee competent to execute it. Analogous trusts have been upheld in this court. [Mason's Exrs. v. Trustees, 27 N. J. Eq. 47; Stevens v. Shippen, 28 N. J. Eq. 532; Goodell v. Ass'n, 29 N. J. Eq. 33.] Did, then, the so-called "abandonment" of the Pennington Academy, and the loan of the money in the manner above stated, put an end to the trust? I know of no principle of law on which it could be so declared. . . . It was urged that because the public authorities had provided, at the public expense, for the education of all children, rich and poor, the court would be under an obligation to apply the fund, if it was to be used at all, to some other charitable use than that of educating poor children; and this, it was said, could not be done, for the reason that the doctrine of *cy pres* is not known to the law of this State. Whether this be true in fact is, at least, questionable. [Newark v. Stockton, 44 N. J. Eq. 19.] But any consideration of the subject is unnecessary, because I do not think it follows that, because the legislature has devised a method by which all the children of the State may receive an education free of charge, testators may no longer devote a part of their estate to the education of the poor. Such a bequest came under consideration in Mason's Executors v. Trustees, supra, and was held good. It is undeniable that the class designated to be benefited by the testatrix is still in existence, and as capable of being the recipients of her bounty now as it ever was. No change is needed in the destination of the fund, though probably a trustee should be appointed to carry out her direction.'

"In In re John's Will, 47 Pac. 341, the will provided: 'It is my desire that my estate shall be used in

establishing and maintaining free schools or school in the town of St. Johns, and that such schools shall be public, and at all times open to the children of the school district which shall embrace the town of St. Johns; and, if my executors shall consider it to be the best interests of the children of said town and district, they may act in concert with the directors of said school district in erecting school houses and maintaining schools.' The court in its opinion says: 'The purpose of the testator was to establish and maintain a school or schools within the town of St. Johns, which should be free and public, and at all times open to the children of the school district which shall embrace such town. That a bounty in support of such a school or schools would be a public charity needs no argument or authority to demonstrate or establish. It comes within the letter and spirit of all definitions of a legal charity. . . . . Nor is it any the less a public charity because, as contended by counsel, the State has for all practical purposes provided for the maintenance of free public schools for all children of school age within the same territory. [Green v. Blackwell, 35 Atl. 375.] The bounty of the State for the support and maintenance of the common schools is a creature of governmental policy, and subject to the will of the people. They may change, modify, or even abrogate the policy, subject to the provisions of the fundamental law respecting it, and the constitution may itself in time be superseded by another. The framers of the constitution have wisely provided for the accumulation of an irreducible common-school fund from the proceeds of land granted to the State for educational purposes, from the proceeds of escheats and forfeitures, and gifts, devises, and bequests made to the State for common-school purposes, and other sources, the interest arising from the investment of which is exclusively applied to the maintenance of common schools. The revenues arising from this source are as yet insufficient for the support and

maintenance of free schools throughout the State during the entire year. For the purpose of supplementing this fund, the legislature has provided for the levy of a four-mill tax in each county. Beyond this, individual school districts may supplement the fund, so as to make the schools absolutely free to the children of school age within such districts. So it may be said that ample provision is made by law for the support and maintenance of free schools in all the districts within the State. But, with all this, it is not compulsory with any district to levy a tax for the support of free schools within its territory, and it may, by neglect to have a school taught for one quarter in each year, forfeit all right for the time being to the school funds derived from whatever source. So that it may be readily seen that even the system provided by the State, while worthy of commendation, and free schools may be maintained under it in all districts, does not guarantee that such schools shall be so maintained, and there is no absolute assurance under the law that a free school may be maintained within the district embracing the town of St. Johns. Hence, there are, in fact, no conditions provided for by the State which will assuredly and inevitably meet the purposes of the testator.'

"In Adams Female Academy v. Adams, 65 N. H. 225, a trust fund given to establish a female academy was administered for sixty years and then turned over to the public school district embracing the same locality. CLARK, J., speaking for the court, says: 'The trust created by the will of Jacob Adams "to establish a female academy in Londonderry for the education of females," was a gift to charitable uses. It was accepted by the trustees, and has been administered for a period of sixty years, according to the purpose of the testator expressed in the will. The trustees represent that circumstances have so changed that the original plan of administering the trust is no longer practicable, and they ask the direction of the court whether they may change

the mode of executing the same by converting certain real estate held by them as a part of the fund into money, and applying the income of the fund to the support of a school in connection with the Adams school-district, a corporation embracing the territory where the Adams Female Academy is located, and empowered by law to receive and use the income of the academy fund for educational purposes. The question is, whether the proposed change in the mode of executing the charity is reasonable and allowable under the terms of the bequest by which it was created,' and concludes that the plan proposed seems best adapted to carry out the charitable intentions of the testator under existing circumstances.

"It is urged by counsel for plaintiff that to permit the trust found in question to be used, in whole or in part, for the support of the public school in district No. 2, will have the effect of lessening the burdens of taxation upon the rich, as well as benefit the poor, and for that reason should not be tolerated. It is no valid objection to such use of the fund, if the direct benefit results to the poor children, although it may incidentally lessen the burden of taxation upon the rich. In In re Strong's Appeal (Conn. 1897), 37 Atl. 395, a bequest was made in trust 'for the benefit of the worthy people of the town of Plainville, as may be in needy circumstances, and in any misfortune.' The court, in answer to a like objection, says: 'In support of the claim that the use is not charitable, it is urged that the bequest adds nothing to what the poor are entitled to receive from the town, and which the town of Plainville is bound by law to supply to its poor; that it is thus merely the creation of ''a perpetual fund for the temporary relief only of the taxpaying classes.'' But, if this be conceded, the conclusion that such a gift is not charitable is unsupported by any other authority in this State or elsewhere. The decisions are to the contrary. So are the best and most thoroughly-recognized

definitions, such as that in Perin v. Carey, 24 How. 465, 506: "A gift which extends to the rich as well as the poor;" or in Jackson v. Phillips, 14 Allen 539, 556, which includes what is given for the purpose of in anywise "lessening the burdens of government." [Hamden v. Rice, 24 Conn. 350.] . . . But it is true, as said in Atty.-Gen. v. Wilkinson, 1 Beav. 370, 373: "You can in no way benefit the poor without at the same time . . . . relieving the rich, either as to their legal duty or their moral obligations. Such relief would seem pretty direct, in many cases which might be cited in our jurisdiction, where charities have been sustained." ' [Citing cases.]

"The rule of construction as applied to charitable trusts, announced by the foregoing authorities, is clearly and tersely stated by Justice GRAY in Jackson v. Phillips, supra (pp. 591-593), as follows: 'The intention of the testator is the guide, or, in the language of Lord COKE, the lodestone, of the court; and, therefore, whenever a charitable gift can be administered according to his express directions, this court, like the court of chancery in England, is not at liberty to modify it upon considerations of policy or convenience. . . . What is the nearest method of carrying into effect the general intent of the donor, must of course depend upon the subject-matter, the expressed intent, and the other circumstances of each particular case, upon all which the court is to exercise its discretion.'

"John Aull bequeathed the sum of one thousand dollars to the county court of Clay county in trust 'to pay the tuition or education of orphan or poor children under the age of sixteen years, at or within two miles of the county seat of Clay county.' Counsel agree that the phrase 'to pay the tuition or education,' as used in. said will, means 'to pay for the instruction or school training of orphans, etc., that is, to pay the fee charged by teacher or school for instruction.' This is the definition given by Dr. E. A. Allen, professor of

English in the University of Missouri, to whom the phrase was submitted for a definition by Col. D. C. Allen, of counsel for plaintiff, and is undoubtedly correct.

"There should be no difficulty in construing the words 'orphans or poor children' as used in said will, as they evidently mean orphans without estate or means to pay for such instruction, or school training, and children whose parent or parents are living, but who are too poor to pay for the same.    In fact,    the words 'poor children,' as used in said will, embrace all those whom the testator included in the beneficiaries of his charity.

"It seems equally clear that the testator intended that said charity should be enjoyed by those residing at or within two miles of the town of Liberty as it existed territorially, at the time of the execution of said will, and not as it might thereafter be constituted. This construction is supported by Board of Education v. Ladd, 26 Ohio St. 210. In that case the testator bequeathed his property 'to be sold to the best advantage, and the proceeds thereof to be placed in the public school fund of Fairfield township, and the same to be applied to the education of the youth of said township.' The court says: 'The only question submitted for determination in this case is whether the testator, in the third clause of his will, refers to Fairfield township as it existed territorially at the time of the execution of the will, or whether the reference is to the township as it might thereafter be constituted. The district court held that the reference was to the township as it then existed; and in this we see no error. If such is not the intent and meaning of the will, its operation might have been enlarged or diminished by the act of the county commissioners in changing the territorial limits of the township; or they might, by allotting the whole territory to other townships, have extinguished the town-

ship and thus have defeated the bequest. Fairfield township, and the public school fund of that township, are only referred to as furnishing the means or instrumentality for reaching the intended objects of the testator's bounty. . . . It is true, as a general rule, that "a will speaks from the death of the testator, and not from its date, unless its language, by fair construction, indicates the contrary intention." [1 Redfield on Wills, 379, sec. 30.] The present case comes within this exception. Fairfield township is referred to in the will as an existing territorial organization, not as the beneficiary of the charity, but as the means of ascertaining such beneficiaries when the time should arrive for its administration. The objects of the charity can be as well ascertained since as before the division of the township. The only effect of the division seems to be that two agencies of a like nature are required to execute the trust instead of one.'

"There was no question raised by counsel as to what was the dominant purpose of John Aull. All agree that it was to provide a fund to pay the instruction of school training of poor children under the age of sixteen years, in the elementary branches as taught in the common schools. On the one hand, however, it is contended that the public school system of Missouri now, and since about 1866, makes ample provision for the class of persons had in mind by the testator, that is, provides a common school education for them; and the original purpose having failed, by application of the doctrine of *cy-pres,* the scheme proposed by plaintiff is the nearest method of carrying into effect the general intent of the donor. By this scheme it is proposed to abolish the age limit of sixteen years, and provide for the education of poor youth in universities, colleges and high technical institutes, whether located in the city of Liberty or elsewhere, and give them academic and professional training.

"If we consider that only one thousand dollars was

bequeathed by the testator for the purpose of education, and the interest alone on that sum was to be used for that purpose, it is evident that John Aull did not have in view a very large or comprehensive scheme of education, or that many would or could be the beneficiaries of his bounty.

"The interest upon the sum of one thousand dollars would have paid the tuition of five children in a private school in Liberty for a term of ten months each year, at two dollars per month, and now, if said fund had not been permitted to accumulate, the interest on said fund, if loaned at eight per cent, would possibly pay the tuition of two pupils, at either of the colleges in Liberty each year. It would not be available, under the scheme proposed by plaintiffs, to those pupils wishing to attend the State University at Columbia, except in the department of medicine, as all other departments are now free.

"Tuition is the smallest item in a collegiate education, if a pupil goes from home, and has traveling expenses, etc., to pay, and the offer to pay tuition alone would be small inducement under such circumstances. It would seem to be evident that John Aull never aimed to do more than provide a limited number of the poor children, living within easy reach of school privileges in the town of Liberty, with the rudiments of an education. He certainly did not intend that the fund should be used to build a schoolhouse, and employ teachers, as it was grossly inadequate for any such purpose, although if that was the only method by which school privileges could have been afforded, the trustee might have been authorized, in the exercise of sound discretion, to let the income accumulate until it became sufficient for that purpose, rather than that the intention of the testator should wholly fail.

"He undertook to provide for a class that was helpless by making the age limit sixteen years. He doubtless saw the children of the poor growing up around

him unable to read and write, and generously wished to contribute to mollify their condition and contribute to the moral and intellectual development of that unfortunate class. But it could not have entered his mind to provide a collegiate and professional education for them, else he would have abandoned the enterprise, or made a more generous provision to meet the demands of such a scheme, and for the same reason he did not expect them to erect a school house and employ teachers. His purpose was to afford to the children of the poor the school privileges already open to the more fortunate class, in the town of Liberty. It was immaterial to him whether the fund should be used to employ teachers for the orphan and poor children living within the prescribed territory, and the children admitted to the schools free of charge, or that the funds should be furnished to their parents or guardians, and by the latter used to pay their tuition in schools already established. What he had in mind, doubtless, was to give to as many orphan and poor children within the prescribed territory as practicable the benefit of a common school education. In fixing the age limit at sixteen years he also had regard to their condition in life, and that when they were sixteen years old, the most of them, if not all, would be compelled to leave school, and go to work for a living. Conditions now are very much the same as they were then. The greater number of children of school age who do not attend school are poor children. The interest of society and their own welfare demand that they shall have an elementary education. While it is alleged in the information that the public schools in the prescribed territory meet all the requirements of this trust, the facts, as disclosed by the answer, show to the contrary.

"The time may come when the courts, in the exercise of their equity, may be authorized to remove the age limit, and employ the charity in question for the higher education of poor young men and women, as so

ably contended for by counsel for plaintiff, but this court, in the light of the authorities cited above, does not feel authorized to do so now.

"The court therefore will direct the entry of the finding of facts and decree in accordance with this opinion."

In accordance with the views expressed in the foregoing opinion, the trial court made a finding of facts, followed by an entry of its decree, based upon such finding as follows:

"It is, therefore, considered, ordered, adjudged and decreed by the court as follows, to-wit:

"1. That said will of John Aull, deceased, created a valid charitable trust for the benefit of poor children, under sixteen years of age, living within two miles of the county seat of Clay county, Missouri, according to the boundaries of said county seat at the date of said testator's death, on the 24th day of January, 1842.

"2. That the heirs of John Aull have no interest in said fund, nor in this suit.

"3. That the dominant spirit and intent of said will was to give an elementary education to the greatest practicable number of poor children, under sixteen years of age, within the limits designated in said will.

"4. That said trust should not be modified either as to age limit or territorial limit.

"5. That the public school system of the State of Missouri has not supplanted said trust, but the same remains in force, and should be executed, but, as to details, with due regard to changed conditions.

"6. That the county court of Clay county, Missouri, in executing said trust, may pay the tuition of the beneficiaries contemplated by said charity either at private schools located within the territorial area of the operation of said trust, and where said beneficiaries live within said area but without said school district No. 2, or may pay the tuition at said public school maintained by said school district No. 2, and may co-oper-

ate with said school district No. 2, in the employment and payment of teachers, either in the graded or high school, as long as a nine months school is maintained annually both as to graded and high school work, and so long as poor children, under sixteen years of age, living within two miles of the county seat of Clay county, as said county seat was organized on the 24th day of January, 1842, shall be admitted to said public school free of tuition; and may, in its discretion, employ any one, or more, or all, of said methods of executing said trust at the same time; and may, until provision is made by law for free text or school books, make an appropriation out of said fund to pay for text or school books for poor children, who, otherwise, will be denied school privileges.

"7. That said trustee formulate rules for the administration and disbursement of said fund, and for giving notice to those who are the beneficiaries thereof, and report same to this court for approval at its next term.

"8. And that the costs of this proceeding be paid out of said trust fund."

Motion for new trial was timely filed, and by the court taken up and overruled, and from the decree as herein indicated, appellants in due time and form prosecuted their appeal to this court and the record is now before us for consideration.

## OPINION.

The learned judge presiding at the trial of this cause in his written opinion has fully and fairly stated this case. We have carefully considered the record in all of its details, as well as the briefs presented by counsel in support of the respective contentions urged by them, and have reached the conclusion that little can be said or added upon the vital questions before us to what is so well said by Judge ALEXANDER, in his exhaustive discussion of the legal propositions in hand, and

his full and reasonable application of the law to the subject involved in this controversy. We fully approve of his announcement of the rules of law as applicable to the questions in dispute in this proceeding, as well as the conclusions reached. In reaching this conclusion we have not been unmindful of the strong presentation by learned counsel for appellant of the important questions disclosed by the record.

It is not out of place to say that learned counsel for appellant have presented the subject of the controversy in its strongest light, and we have read with deep interest and great pleasure the brief and argument now before us, which evidences not only great legal learning, but as well indomitable energy and unbounded research.

In the exercise of the equity powers and jurisdiction of the court in this proceeding to enforce and preserve this charity trust fund created by the will of John Aull, it is the duty of the chancellor, as was ruled in Lackland v. Walker, supra, to preserve and make useful what may be called the spirit of the charity and give effect to the expressed charitable purpose of the donor as near as may be, to the end that the controlling purpose and intent of John Aull, as disclosed by the instrument presented for construction, may be effectuated.

While we fully appreciate the high conception of learned counsel for appellant as to the necessities and benefits flowing therefrom of thorough collegiate training and study, in our opinion, to undertake to remove the age limit in the clause of the testator's will now under consideration, and apply this charity trust fund to furnish children over the age of sixteen years with collegiate educations, would absolutely be foreign to the intent and purpose of John Aull in creating such charity trust fund.

It is insisted that the county court, in the administration and management of the trust fund, in accord-

ance with the finding of facts and decree of the trial court, would be delegating its trust to the school district, which it had no authority to do. We do not regard the decree as authorizing the county court to delegate its trust; it simply means some departure in the administration of the trust authorized by the changes in conditions by reason of the public school system and while the county court fully administers the trust it calls to its aid a part of the public school system, to the end that better results may be secured.

John Aull, doubtless, was essentially a practical man, lived in a purely practical age, in the history of this State. He fully realized then, as we do now, that a charity bestowed upon poor children, in the way of school training, would accomplish best results by reaching them in their tender years. That this comparatively small charity fund might accomplish its greatest benefits, the testator confined its application to poor children under sixteen years of age; this he had the right to do and his good judgment should be commended for so doing.

While for the purpose of preserving and practically applying this trust fund, a departure may be permitted in the administration of the trust, this does not mean that the controlling purpose and spirit of the trust, as disclosed by the testator, in his will, shall be ignored or violated, and in directing the administration and management of this trust fund, it is the plain duty of the chancellor to effectuate, as near as can be, the intent and purpose of the donor, as disclosed by the clause of his will, which is under consideration in this proceeding.

We do not share the apprehension of learned counsel for appellant, indicated in their brief, that this charity fund will be wasted and misappropriated. Its large increase, from the accumulation of interest, would indicate that the investment of it had been carefully guarded.

We see no necessity for pursuing this subject further. The trial judge, in his written opinion, fully covered this case, and the admisistration and management of this charity trust fund, along the lines indicated by the opinion of the learned trial judge, as nearly approaches the carrying out of the trust in accordance with the controlling purpose and intent of John Aull as could be done under the present conditions surrounding the community embraced in the clause of the will creating the trust.

Entertaining the views as herein expressed, the finding and decree of the trial court should be affirmed, and it is so ordered.

All concur.