ST. LOUIS, MEMPHIS & SOUTHEASTERN RAIL-
ROAD COMPANY, Respondent, v. HOUCK, Ap-
pellant.

**St. Louis Court of Appeals, November 13, 1906.**

1. **CONTRACTS: Subscription Contract: Construction.** In con-
struing a conditional contract of subscription to aid in building
a railroad and determining what constitutes a performance of
such contract, the intention of the parties is a primary con-
sideration; and in determining what the intention was, the
court has a right to consider the subject-matter of the agree-
ment, the inducement which influenced the subscriber to sub-
scribe, the circumstances under which the subscription was
made and the phraseology in which it was expressed.

2. ——: ——: **"Through or Into" a Town.** Where a sub-
scriber agreed to pay a certain sum to a railroad company
when the latter should have "constructed and begun the opera-
tion of . . . a railroad . . . from Zeta through or into
Bloomfield . . . to the town of Campbell," and where the
inducement to make such subscription was that the building
and operation of the railroad might be beneficial to the sub-
scriber by enhancing the value of his property or promoting
his business in Bloomfield, the words "into or through" meant
that the railroad was to be constructed and operated into the
corporate limits of the city of Bloomfield as those limits were
at the time the contract was executed and not into such limits
as they might thereafter be extended.

3. ——: ——: **Substantial Compliance.** A substantial com-
pliance with the conditions of a subscription contract is all the
law requires in order that the liability of the subscriber may
become fixed.

4. ——: ——: ——: **"Constructed."** Where a subscription
to a railroad was made upon the condition that it should be con-
structed and its operation begun from "Zeta through or into
Bloomfield to the town of Campbell," and where at the time
the subscription was made the railroad was already operated
from Zeta into Bloomfield and the purpose was to secure the
construction and operations of the line through or into Bloom-
field to the town of Campbell, which was in the opposite di-
rection from Zeta, and where it was admitted by the sub-
scriber that the old line from Zeta to Bloomfield was a suffi-
cient compliance with that part of the requirement and where
the road was constructed to Campbell but connected with the

old road outside the limits of Bloomfield, this was a substantial compliance with that part of the contract which provided the railroad should be "constructed into Bloomfield."

5. ———: ———: ———: "Operation Begun." And where a new depot was erected at the junction of the new road with the old at a point more than a quarter of a mile outside the original limits of the town of Bloomfield and within the limits as extended after the contract was made, and where the old depot was within the original limits and trains were operated to the old depot only temporarily and not with the intention of continuing to run trains there, the "operation," was not "begun" within the meaning of the contract, so as to make the subscriber liable thereon; neither did the running of particular trains for limited purposes into the original limits of the city constitute an "operation" of the railroad within the meaning of the contract.

6. ———: ———: ———: ———: Evidence. And in determining the railroad company's good faith in beginning operation, evidence was admissible to show that prior to the completion of the road it was active in endeavoring to procure an extension of the city limits for the purpose of building into the proposed extension instead of inside the original limits.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster,* Judge.

REVERSED AND REMANDED.

*Bond, Marshall & Bond, Geo. L. Corliss* and *N. A. Mosley* for appellant.

(1) (a) Words used in a contract must be given their plain, ordinary, and popular meaning, unless from the context or by usage they have acquired a different meaning. R. S. 1899, sec. 4160; Ruby v. Coal & Mining Co., 21 Mo. App. 159; Fruin v. Railroad, 89 Mo. 397; Stettauer v. Hamlin, 97 Ill. 312; Steyer v. Dwyer, 31 Iowa 20; 17 Am. & Eng. Ency. of Law (2 Ed.), p. 11. (b) The most conspicuous and wide-reaching of all rules of interpretation is the one requiring that a written contract be so construed as to give effect to the intent of the parties. Bishop on Contracts, p. 148, sec. 380.

(c)   If it is asserted that the words used in a contract have a meaning other than the popular one, the burden is upon the party making the assertion to establish it by competent proof.   (2)   Subscription contracts to aid in the construction of railroads are construed strictly against the promisee.   Garrison v. Cook, 72 S. W. 56. (3)   (a)   The words "through or into Bloomfield" when used in a contract for the construction of a railroad, mean through or into the town or city of Bloomfield as popularly understood, and not through or into the municipal corporation.   Wichita v. Burleigh, 12 Pac. 332, 36 Kan. 34; Denver v. Coulehan, 39 Pac. 425, 20 Col. 471, 27 L. R. A. 751; Wilder v. McConnell, 45 S. W. 145; 91 Tex. 600; The Society of the Cincinnati's Appeal, 154 Penn. St. 621; Enterprise v. State, 10 South. 740, 29 Fla. 128; Fitz v. Boston, 58 Mass. (4 Cush.) 365; Rogers v. Female College, 39 L. R. A. 640; Smith v. Sherry, 50 Wis. 217.   (b)   The ordinary and popular conception of a town or city is a collection of houses, habitations, and citizens gathered together in one mass and occupying a compact and contiguous territory, and has no relation whatever to the limits of the municipal corporation.   28 Am. and Eng. Ency. of Law (2 Ed.), p. 282.   (4)   Even if the word "Bloomfield" in the contract be held to refer to the municipal corporation and not to the town, still for the purpose of determining what is a performance of the contract, the corporate limits will be considered as they existed at the time the contract was made.   Crow v. Clay County, 95 S. W. 379; Rothenberger v. Clark, 22 Ind. App. 288; Tobey v. Moore, 130 Mass. 448; The Society of the Cincinnati's Appeal, 154 Penn. St. 630.

*L. F. Parker* and *J. G. Egan* for respondent.

(1)   When a term has a fixed legal meaning and that term is used in a contract, it is presumed that is the meaning that is referred to.   9 Cyc. of Law and Prac.,

583; 17 Am. and Eng. Ency. of Law (2 Ed.), 13.   (2)'
The legal meaning of Bloomfield is the municipal cor-
poration of Bloomfield. Laws of Mo. 1869-70, pp. 240,
241, sec. 2 of the Act of March 25, 1870; sec. 7, art. 9,
Const.   (3)   The word "city" means municipal corpora-
tion.   Jackson v. Railroad, 157 Mo. 634.   (4)   The word
"town" includes in its meaning an incorporated city.
State ex rel. v. Simmons, 35 Mo. App. 374, 379, 380;
Glasgow v. St. Louis, 15 Mo. App. 112, 123; Van Riper
v. Parsons, 40 N. J. L. 1; Flinn v. State, 24 Ind. 286;
Indianapolis v. Higgins, 141 Ind. 1, 40 N. E. 674;
Klauber v. Higgins, 117 Cal. 451, 459-463; Odegard v.
Albert Lea, 33 Minn. 351, 23 N. W. 526; State v. Glennon,
3 R. I. 276; 1 Blackstone, Commentaries (Lewis' Ed.),
114, 115.   (5)   The word "Bloomfield" in the contract
meant Bloomfield with its boundaries as they should
be at the time of the construction and putting into oper-
ation of the railroad.   Gas Light Co. v. St. Louis, 46
Mo. 133.   Des Moines v. Waterworks Co., 95 Ia. 348,
64 N. W. 275; People ex rel. v. Telephone Company,
—— Ill. ——, 77 N. E. 245; Railway v. Hoffman, 161
Ind. 593, 69 N. E. 401, 402; People v. Deehan, 153 N. Y.
528; Railway v. Chicago, 176 U. S. 667.

STATEMENT.—This action arose on the following
contract:

"We, the undersigned, in consideration of the bene-
fits to us accruing from the construction and operation
of the railroad hereinafter mentioned, and for other good
and valuable considerations, hereby agree to pay to the
St. Louis & Gulf Railway Company, its successors or as-
signs, the amount set opposite our respective names,
when the said St. Louis & Gulf Railway Company shall
have constructed and begun the operation of a standard
gauge line of railroad extending from Zeta in the county
of Stoddard and State of Missouri, through or in to
Bloomfield and Dudley to the town of Campbell, in the
county of Dunklin and State of Missouri; and when

said St. Louis & Gulf Railway Company shall have caused the St. Louis Union Trust Company of the city of St. Louis to execute in favor of the undersigned a bond in a sum aggregating the amounts agreed by the undersigned to be by them respectively paid as aforesaid, conditioned that said line of railroad shall be maintained and operated for a period of five years by said St. Louis & Gulf Railway Company, its successors or assigns, between and into the points aforesaid, from the time when the operation of said line of railroad shall begin.

| Names. | Amounts Agreed |
| George Houck | to be Paid. |
| | $1,000.00." |

Other names and amounts follow.

The defendant refused to pay his subscription on the ground that the condition on which it was made had not been performed by either the original obligee, the St. Louis & Gulf Railway Company, or plaintiff, which succeeded to all property and contract rights of said obligee by an indenture dated June 1, 1904. The default in performance relied on as defense is that the contemplated line of railroad was never constructed into or through the town of Bloomfield, nor its operation through or into said town begun. Bloomfield is the county seat of Stoddard county. We have found no statement in the record of its population, but its dimensions are testified to have been about three-quarters of a mile either way at the date of the subscription contract, which was in October, 1902. At that date and prior thereto, the St. Louis & Gulf Railway Company owned a railroad running from Zeta into the corporate limits of Bloomfield. It extended inside the limits about half a mile. On June 2, 1903, the municipal council of Bloomfield enacted an ordinance calling for an election to pass on the question of extending the corporate limits

of the city, so as to take in new territory described in the ordinance. Said territory extended northward 1,980 feet or three-eighths of a mile from the original northern boundary of the city. There is evidence in the record going to show that this territory was of a rural character, but slightly settled and consisted of fields and meadows. One witness testified that farms with fields of wheat and corn were in it and that it was outlying land. On June 30th, the proposition to extend the city limits was voted on by the eligible voters of Bloomfield and carried. On the same day the mayor of the city issued his proclamation declaring the result of the election. Meanwhile a line of railroad was in process of construction from Bloomfield northwest to Campbell in Dunklin county, and on June 28, 1903, this new line was connected with the old line which ran from Zeta to Bloobfield thereby completing the through line of road from Zeta to Campbell. The point of junction was near the north boundary of the extended city limits of Bloomfield; perhaps a trifle outside the new northern boundary. From the junction, the railroad curved slightly to the south and west so as to run through the northwest corner of the extended territory, to be taken into Bloomfield by the election called for June 30th, two days after the railroad was completed. This diagram will assist in understanding the location of the new and the old lines of railroad with respect to the city of Bloomfield, as it was both before and after its enlargement:

Railroad v. Houck.

The record is somewhat uncertain regarding the exact date when the railroad was put into operation from Zeta to Campbell; but the civil engineer in charge of the line testified that the first day of its operation was, as stated, June 28, 1903. A few months after the completion of the new line, the old depot within the original limits of Bloomfield was abandoned, a new depot having been built near the northwest corner of the new territory. The new depot was a trifle less than a half a mile from the old one and about 1,500 feet, or more than a quarter of a mile, from the original north boundary of the city. The evidence goes to show that after the new depot was built, no trains ran down the old track into the original city of Bloomfield, except one train which went to Brownwood. This train ran into Bloomfield so that the men who operated it might get their dinner at their own homes at noon and go to their homes at night. It seems that it is left on the track during the night. There was testimony that freight in carloads was sent into Bloomfield over the old track, but other testimony inclines to show that this was only done to accommodate a sawmill situated on the old track; that cars of logs to be sawed in the mill are taken down on that track and placed on an adjacent sidetrack. The witnesses agree that all local freight and all passengers were handled at the new station and that the old track is not operated except to deliver carload freight. Testimony was given for the plaintiff that the original line was operated to the old depot just as it had been from the first, for several months, or longer, after the completion of the new line. On the contrary it was given in the evidence for defendant that, though the trains were operated to the old depot for a short time after the construction of the new line, this was with no intention to continue the operation to that point, but merely because the new depot had not been completed; that as soon as it was completed, the old line was discontinued, and no longer used

for passengers, freight and express, except as said, for carload freight to the sawmill. There was a conflict of testimony on the issue.

During the trial this admission was made:

"The defendant admits that the St. Louis & Gulf Railway Company constructed a standard gauge line of railroad from Zeta in Stoddard county through Dudley to Campbell, and put it into operation prior to the time that they drew the draft mentioned in evidence on the defendant for the amount of his alleged subscription, but we deny that it was constructed or operated into or through the town of Bloomfield; and it is conceded that Campbell is in Dunklin county, Missouri, and Dudley is in Stoddard county, Missouri."

The court directed a verdict in plaintiff's favor and this having been returned and judgment entered on it, defendant appealed.

GOODE, J. (after stating the facts).—The admission made by the defendant that the St. Louis & Gulf Railway Company had constructed a standard gauge railroad from Zeta through Dudley to Campbell and put it into operation, prior to the demand on defendant for payment of his subscription, takes out of the case the question of whether building a line to Campbell to connect with the old line from Zeta to Bloomfield at the latter place, was a compliance with the condition of the subscription; or whether a new line should have been constructed the entire distance from Zeta to Campbell. In connection with the admission, defendant's counsel stated, in effect, the defense to the action, namely; that though the road had been constructed from Zeta to Campbell, it was neither constructed or operated into or through the town of Bloomfield. Whether this position is well taken or not is the point for decision. In support of it the proposition is advanced that constructing and operating a road through or into Bloomfield meant through or into that portion of the town covered by

dwellings and residences and not merely into its original boundaries. It is unnecessary to pass on this point, because several maps of the city of Bloomfield are in the record and have been submitted for our inspection, which show the original territory of the city is so compactly built over that, for the purpose of determining whether or not the subscription contract required the contemplated railroad to run inside said limits, or to run in proximity to the territory occupied by buildings, we may treat the two areas as identical.

The real question is whether or not operating the line through the northwest corner of the extended territory of the city, in connection with such continued operation into the original city limits as the evidence for plaintiff tends to establish, constituted performance of the condition on which the defendant agreed to pay. The primary inquiry in this connection is, of course, what the parties intended at the time they made the contract; and in answering this inquiry we have the right to consider the subject-matter of their agreement, the inducement which influenced the defendant to subscribe, the circumstances under which the subscription was made and the phraseology in which it was made. [State v. Old Town Bridge Co., 85 Maine 17; Rogers v. Galloway Female College, 64 Ark. 627, 39 L. R. A. 636, 639.] The subject-matter is the construction of a railroad from Zeta through and into Bloomfield and thence to Campbell; a line some forty-three miles in length. What induced defendant to subscribe is stated in the contract itself. The main inducement was the benefit to accrue to him from the construction and operation of the road; and though other good and valuable considerations are mentioned in the instrument, there was no proof, nor attempt to prove, that any other consideration existed. Defendant is a citizen and business man of the town of Bloomfield, and it is fair to presume that he subscribed because he thought the building of the road according to the terms of the contract would bene-

fit him financially. One fact to be considered is the area of Bloomfield when the subscription was made; the boundaries of the city at that time. The importance of this fact is apparent. If the projected railroad was built and operated through or into Bloomfield as it then was, with a depot somewhere inside the city limits, it might prove very beneficial to defendant by enhancing the value of his property or adding to the volume of his business; and in view of such a benefit, he might be willing to give liberally to procure the road. But if the road was to be built and operated more than a quarter of a mile outside the city limits, with its depot that far away and the old depot abandoned, it might prove detrimental to his interest by depreciating his property or diminishing his business. In view of that possibility, defendant might have preferred to give money to prevent, rather than to induce, the building of the road. It is matter of common knowledge that constructing lines of railroad near small towns but not to them, and building depots a short distance away, often injures, and sometimes ruins, the town by developing a new business and residence district around the railroad station. These considerations favor the view that the defendant subscribed with the understanding that the railroad was to run into the city of Bloomfield as it then was, and not merely into some future extension of its territory. The phraseology of the agreement is that the road should run through or into Bloomfield; words excluding the interpretation that it would be sufficient for the road to run near the city or even immediately out side its corporate limits. The words "through or into" definitely express the thought that the road was intended to go inside the city limits. "Into" carries the notion of entering, and "through" of passing in and then out of, the city boundaries. Taken in connection with the subject-matter, the consideration which induced defendant to subscribe and the circumstances as they then were, we hold that the true meaning of the contract was that

the line of railroad should be constructed and operated
either through or into the corporate limits of the city of
Bloomfield as those limits were at the time the contract
was signed. Precedents for the construction of a par-
ticular contract are difficult to find, because the meaning
of every contract turns on its own language and the cir-
cumstances under which it was made. We refer to the
following cases as being more or less analogous. [Crow
v. Clay County, 95 S. W. 369; Tobey v. Moore, 130 Mass.
448; Rotheberger v. Glick, 22 Ind. App. 288; Soohan v.
Phila. 33 Pa. St. 9.] The case first cited involved the
scope of a charity created by the bequest of a fund in
trust, the interest to be applied by the county court of
Lafayette county, Missouri, to pay the tuition and edu-
cation of orphan children at or within two miles of the
county seat. It was ruled that the testator intended the
charity to be for the benefit of children of the designated
class, residing within two miles of the county seat as it
territorially was at the execution of the will, and not as
it might thereafter be constituted; the boundary having
subsequently been enlarged.

In Tobey v. Moore an owner had conveyed to dif-
ferent grantees several city lots with a restriction that
no buildings designed for certain enumerated trades and
callings, should be erected within eight feet of the street
on which the lots abutted. Subsequently the municipal
authorities of the city had widened one of the adjacent
streets and a lotowner having begun to erect a prohib-
ited building within eight feet of the street as widened,
it was held that the restriction in the deed had reference
to the line of the street as it was when the conveyance
was executed, and only prohibited the designated build-
ings from being erected within eight feet of said line;
not within eight feet of the line of the widened street.

Rotheberger v. Glick was an action for a subscrip-
tion for the erection of a church building on a certain
lot. The house was not built on the site described in
the subscription contract, but on one across the street

and seventy-five feet distant. It was held that the terms on which the subscriber had signed, had not been complied with and he was exonerated from liability.

Soohan v. Philadelphia involved the construction of the will of Stephen Girard, who had left a trust fund for the erection and support of a college for the benefit of orphan children. The will gave a preference to orphans born in the city of Philadelphia, and they were entitled to the benefit of the fund in the first instance. The question was whether that meant the territory of the city of Philadelphia as it was at the death of the testator, or the territory within its subsequent boundaries. The court held that the intention was to give a preference to orphans born within the original corporate limits of the city.

We are cited by plaintiff's counsel to a series of cases supposed to support the proposition that it was contemplated by these parties that the corporate limits of Bloomfield might be extended in the future and if that happened, building the projected railroad into or through the extended territory would be a performance of the conditions on which the subscription was made. The cited cases are Gas Light Co. v. St. Louis, 46 Mo. 121; People ex rel. v. Gas Light Co. 153 N. Y. 528; People ex rel. Chicago v. Telephone Co., 77 N. E. 245; Ill. Cent. R. R. v. Chicago, 176 U. S. 646; City of Des Moines v. Water Works Co., 95 Ia. 348; Ind., etc., R. R. v. Hoffman, 161 Ind. 593. The point of law decided in several of these cases was that a contract made between a municipality and a public service company for furnishing service to the municipality and its citizens at stated prices or for the use of the street by the company, applies not only over the territory within the city limits when the contract is made, but territory included afterwards. Some of the other cases determine, in substance, that reasonable municipal ordinances for the regulation of public service corporations and their charges will be enforced

throughout the limits of the municipality as they are enlarged by extensions from time to time.

In Gas Light Co. v. St. Louis, the city and the Gas Light Company had entered into a contract in 1846, by which the company agreed to furnish, and the city to take, gas at a certain price. Subsequently the limits of St. Louis were extended and the company claimed the right to collect at the same rate for gas furnished in the enlarged limits; whereas the city contended that the price originally fixed ruled only within the limits as they then existed. The court said that a city ordinance or contract designed for the city at large, operates throughout its boundaries, whatever changes occur in them.

In Ill. Cent. R. R. Co. v. Chicago, the charter of the railroad company provided that it should not locate its tracks in any city on its line without the consent of the common council. It attempted to locate certain tracks along the water front of Chicago on the shore of Lake Michigan, against the will of the city; contending that said charter provision only applied to the city of Chicago as it was in 1851, when the charter was granted; and that as the territory on which the company was attempting to lay a track was not then within the limits of Chicago, the consent of said city to the laying of the track was not required, though the land on which it was to be laid was afterwards taken into the city. The court said the object of the charter provision was to protect cities in general and not simply as they existed at the date of the charter.

The other cases relied upon by plaintiff are similar to the two we have just digested, which manifestly are not in point on the proposition we are considering. It is just and reasonable to say that when a city contracts for service to be rendered to it as a corporate entity, or for a service at a given rate to all its citizens, an expansion of the service corresponding to the growth of the city is contemplated. It is also reasonable that ordinances designed for the government of a municipality

and the regulation of persons and property within its sovereignty, should be enforced over the entire area of the city and, if this is enlarged, that the ordinance shall become effective in the added territory. The present case rests on different considerations. In subscribing to procure the railroad into Bloomfield, the defendant had in view his personal advantage. He was thinking of the benefit that would accrue to him from having the railroad built through or into Bloomfield as it then was and cannot, in reason, be supposed to have assented to building it barely inside any extension of the city limits, however large, that might be made prior to the road's completion. No time was fixed in which it should be completed, and such construction of the contract might entirely defeat the purpose the defendant had in view. We regard the extension of the city's boundaries subsequent to the date of defendant's subscription as a circumstance not affecting his liability.

The next question to be considered is whether or not such construction of the new line, and operation of it in connection with the old line, into the original limits of Bloomfield as plaintiff's evidence tended to establish, constituted performance of the conditions of the subscription. It is to be observed that the contract did not make the payment of the donation depend on a continuous operation of the railroad through Bloomfield for five years, but on the road having been constructed, its operation begun and a bond given to the subscribers conditioned that it should be maintained and operated for five years. The bond was given. Hence the question in this connection is twofold; was the line constructed into Bloomfield within the true meaning of the contract, and if so, was the operation of it into the city begun within such meaning? A substantial compliance with the conditions of a subscription is what the law of this State requires in order that the liability of the subscriber may become fixed. [Mo. Pac. R. R. v. Tygard, 84 Mo. 263.] By substantial compliance we understand

that, although the conditions of the subscription be de-
viated from in trifling particulars which do not mater-
ially detract from the benefit the subscriber would de-
rive from literal performance, but leave him substantial-
ly the benefit he expected, he is bound to pay. Counsel
for defendant admit that by building a new line to
Campbell and connecting it with the old line of railroad
previously running from Zeta to Bloomfield, a railroad
was constructed within the meaning of the subscription
contract. What was denied was that it was constructed
into Bloomfield. But if the use of the old line from the
junction point to Zeta was a sufficient compliance with
the requirement that a railroad be constructed from
Zeta to Campbell, there is no reason for saying that the
use of that portion of the old line which ran into Bloom-
filed was not a compliance with the agreement to build
into Bloomfield; provided such portion was reason-
ably adapted for running trains into and out of the city.
The operation of trains over the projected railroad into
or through Bloomfield, was what was desired by the de-
fendant; and it was immaterial to him that this was done
over a portion of the old line, if freight and passengers
could be conveniently handled over it. There was evi-
dence that they could be and none to the contrary. For
some time after the through line was in operation, pass-
enger and freight trains ran to and from the old depot
and over the old railroad, in going into and out of the
city. It is to be noted further, that the contract provid-
ed that the railroad should be built either through or
into Bloomfield; language indicating that the railroad
company had a choice between building the road so that
trains would run through Bloomfield on a continuous
line, or into it and out again over the same route. In
other words, it was contemplated that the junction of
the new road with the old might be at a point away from
the Bloomfield depot, and trains use that portion of the
old road which ran to the old depot in getting into and

out of the city. We therefore hold that the railroad was constructed into Bloomfield within the intention and understanding of the parties.

The next inquiry is, was its operation begun? Plaintiff insists that it was, because the evidence shows without dispute that, for a while after the through line was put into operation from Zeta to Campbell, all trains ran to and from the old station. It is true that the witnesses agree as to this fact, but it does not follow necessarily that the operation of the road into Bloomfield was begun in the sense of the contract. We construe the proviso to mean that the operation should be begun in good faith and with the intention of continuing to run trains in and out of the city for five years, not merely to do so temporarily, for the purpose of fulfilling the letter of the subscription contract, and then divert them. It is true the contract makes the liability of the subscribers depend, not on a permanent operation of the road into Bloomfield, but on the railroad company's beginning to operate it; providing other redress for the subscribers on the company's bond if operation into the city was discontinued later. Nevertheless, we hold the agreement was that there should be a bona fide commencement of operation with a present intention of continuing it for five years. An operation designed to be temporary, either in order to conform to the words of the subscription, or as a makeshift until a depot was built outside Bloomfield, and to be stopped as soon as the new depot was finished, was not beginning to operate the road into Bloomfield within the sense of the contract. A case in point on this proposition is Texas & Pac. R. R. v. Marshall, 136 U. S. 395, wherein relief in equity was sought by the city of Marshall, Texas, against the violation by the railroad company of a contract to permanently establish the eastern terminus of the company's line of railroad at Marshall, and to construct and maintain there the main car works and machine shops, in consideration of a large bonus given to the company by the city. The

evidence showed the railroad company had, in fact, established the eastern terminus of its line at Marshall, and had located its shops there. The trial court found that the contract was duly executed by both parties. The terminus and shops remained at Marshall for eight years, when the terminus was changed to another place and parts of the shops removed. The point of law involved was whether, in view of the proviso in the subscription agreement that the terminus should be established permanently at Marshall, the company had the right to change it and move its shops after eight years. It was held that if the eastern terminus and the shops and car works of the railroad company were established at Marshall, "with the purpose that it (i. e., this location of them) should be permanent," the contract was performed by the company and that it had not covenanted to keep up the arrangement forever, regardless of the needs entailed by changes which might occur in the course of time. The opinion said, *inter alia*:

"It appears to us so far from this, that the contract on the part of the railroad company is satisfied and performed when it establishes and keeps a depot, and sets in operation car works and machine shops, and keeps them going for eight years, and until the interest of the railroad company and the public demand the removal of some or all of these subjects of the contract to some other place. This was the establishment at that point of the things contracted for in the agreement. It was the fair meaning of the words 'permanent establishment,' as there was no intention at the time of removing or abandoning them."

This high authority lays stress, as will be seen, on the good faith with which the railway company located its terminus and shops, and on whether or not it did so with the intention of making the location permanent or merely temporary; that is, on whether the intention was to keep its agreement with the city in good faith, or merely in appearance. The same principle is

applicable in the present case and we hold that the plaintiff, to earn defendant's subscription, was bound to begin to operate its road into Bloomfield intending to continue the operation five years. Neither do we think that running a local train to and from the depot for the convenience of the train crew, or carload freight over the old track to accommodate a mill, was operating the road into the city in the sense the subscription intended. The subscribers understood and had a right to understand from the language used, that regular passenger and freight trains would be run into the city. It is our opinion that the issue of whether or not the railroad was begun to be operated into the city in good faith, rested on contradictory testimony and should have been determined by the triers of the fact. On the question of the railroad company's good faith, evidence was competent which tended to show that, prior to the completion of its road, the company was active in endeavoring to procure an extension to the city limits for the purpose of building into the proposed extension, instead of inside the original corporation.

The judgment is reversed and the cause remanded. All concur.