[No. 9150.   Department Two.   October 29, 1910.]

E. E. PETERSON, *Respondent*, v. TACOMA RAILWAY & POWER COMPANY, *Appellant*.[1]

STREET RAILROADS—FRANCHISES—FARES—CONTRACTS — MUNICIPAL CORPORATIONS—ORDINANCES—ANNEXATION OF TERRITORY — EFFECT.   A franchise ordinance requiring a street railway to transport passengers from any point within the city limits on any line of the company to the terminus of its line, and to issue transfers for a continuous trip one way to and from all lines for a single fare of five cents, enacted pursuant to a peace contract entered into to settle disputes and correct abuses relating to transfers and fares, is operative over territory subsequently annexed to the city; and, upon annexation, embraces an existing line, formerly outside the city limits, over which the company was operating cars as a part of its city system under a county franchise, the county franchise being abrogated by the annexation and contract.

SAME—OBLIGATION OF CONTRACT.   Such an ordinance does not impair the obligation of any contract.

SAME—ORDINANCES — CONTEMPORANEOUS CONSTRUCTION.   Such an ordinance not being doubtful, contemporaneous construction by the city, or acquiescence therein, cannot be worked to aid in its interpretation.

Appeal from a judgment of the superior court for Pierce county, Shackleford, J., entered June 18, 1910, in favor of the plaintiff, upon an agreed statement of facts, in an action by a passenger for wrongful ejection from a street car. Affirmed.

B. S. *Grosscup* (*Jas. B. Howe* and *Wm. C. Morrow*, of counsel), for appellant.

*Fitch & Jacobs* (*T. L. Stiles*, of counsel), for respondent.

[1]Reported in 111 Pac. 338.

CHADWICK, J.—In its inception the present Tacoma Railway & Power Company acquired control of various lines of street railway operating under a number of distinct franchises in the city of Tacoma. These lines operating independently were under no obligation, unless so provided in the franchise, to exchange or transfer passengers from one to the other. In consequence great confusion was put upon the citizens. Transfers would be allowed, some from one line to another, and denied upon the same lines to others. Transfers would be allowed at certain points and denied at others. The growth of the city demanded a correction of these abuses, and to save further trouble and disputes, the Tacoma Railway & Power Company and the city of Tacoma entered into a contract in which mutual promises and concessions were made. We shall quote the parts of the contract pertinent to the present inquiry, together with the preamble of the ordinance authorizing the commissioner of public works to enter into it:

"An ordinance authorizing and directing the commissioner of public works of the city of Tacoma to enter into a contract for and on behalf of said city with the Tacoma Railway & Power Company . . . for the settlement of certain differences and disputes heretofore existing between said city and said company. . . .

"Fifth. On and after the first day of April, 1903, the said party of the first part shall transport any person from any point or place within the corporate limits of the city of Tacoma, on any line or lines of street railway owned, operated or controlled by said party of the first part, to the terminus of its line in Point Defiance Park, for a single fare not exceeding five cents, and the party of the first part agrees that it will from and after the date of this agreement, extend its present transfer system for a continuous trip one way to and from all lines within the city of Tacoma (and including that portion of the Point Defiance line outside of the city of Tacoma), but nothing in this section shall be so construed as to require the issuance of transfers which can be so used on parallel or other lines as to make it possible for a passenger to make a round trip for one fare, nor to prevent the party of the first part from making and enforcing all rea-

sonable rules and regulations necessary, in its judgment, to prevent fraud. .. . .

"Seventh. And said party of the first part further stipulates, agrees and consents to and does hereby waive and relinquish each and every right, privilege and authority conferred and granted in and by any street railway franchise now held and owned by said party of the first part to the extent only that the same are inconsistent and in conflict with the terms, conditions and provisions of these articles of agreement.

"Eighth. That said city of Tacoma, the party of the second part, for and in consideration of the foregoing agreements made and to be executed by the party of the first part, does hereby agree that upon the proper execution, in duplicate, and delivery of this agreement, by each of said parties to the other, to give its consent, by ordinance, to the transfer and assignment of all the right, title and interest in and to each and every of these certain franchises granted by the city of Tacoma for street railway purposes, which the said party of the first part may now own, either as the original grantee or as assignee."

So far as the record shows, no dispute has arisen between the city and the railway company, excepting in so far as the contract may be held to apply to the following condition: A part of one of the railway company's acquired lines runs beyond the city limits about a mile, terminating at the village of Fern Hill, a suburb of the city of Tacoma. From the point where this line crosses the city limits to Fern Hill, the road was operated under a franchise granted by the commissioners of Pierce county, and the company had been accustomed to charge an additional fare of five cents for a passenger going beyond the city limits, and also an additional fare of five cents for each passage initiated beyond the city limits. So that the fare to or from the village of Fern Hill was ten cents, instead of the customary five-cent fare charged on all other lines in the city. On July 9, 1909, the city passed an ordinance under which the limits of the city were extended so as to take in additional territory. The line of the railway from the city limits to Fern Hill was in the included area.

It is the contention of the railway company that the line from the old city limits to Fern Hill, being built and operated under a county franchise and being beyond the legislative jurisdiction or contractual power of the city at the time the contract was made, and further that the spirit and terms of the contract as well as its object were to cover only existing disputes, it still has a right to charge a ten-cent fare to and from Fern Hill. The city contends that the object of the contract was not only to cover existing differences, but to insure a five-cent fare within the city limits of Tacoma whenever and wherever the limits of the city might be extended; that the burden follows the benefits of the original franchise as well as the contract, and the added territory being now a part of the city of Tacoma, the company is bound to carry all passengers within the present city limits for a flat five-cent fare. Thus disputing, the parties came to the superior court of Pierce county, where it was decided that the company could charge a five-cent fare and no more.

Certainty is the strength of the law, and it is proper to look to our own decisions, as well as those of other states, for guidance in our interpretation of the contract. But one case has been decided by this court involving a like principle. *Seattle Lighting Co. v. Seattle,* 54 Wash. 9, 102 Pac. 767. In that case the franchise was a general grant to lay pipes "throughout the city of Seattle and throughout any addition thereof," and "as the boundaries thereof are or may be extended." It was held that the company could operate under its franchise in new territory beyond the old city limits, and that it was not confined by the terms quoted to unplatted area within the boundaries existing at the date of the franchise. The court followed the leading case upon this theory of the law. *St. Louis Gaslight Co. v. St. Louis,* 46 Mo. 121, and other apt authority. The argument of the court was further sustained by the assertion of a rule deduced from the following authorities: *Toledo v. Edens,* 59 Iowa 352, 13 N. W. 313; *Indiana R. Co. v. Hoffman,*

161 Ind. 593, 69 N. E. 399; *McGurn v. Board of Education*, 133 Ill. 122, 24 N. E. 529. The court said:

"It seems clear that, when new territory is brought into a city, general ordinances of the city immediately control the new as well as the old territory, and do not require express legislative action to give them such application. . . . An ordinance granting a franchise generally stands upon the same footing as any other ordinance of the city." *Seattle Lighting Co. v. Seattle, supra.*

The case of *Indiana R. Co. v. Hoffman* is quite in point. A contract similar in terms, and designed to cover substantially the same disputes, was entered into between the company and the city. It was agreed that the company would,

"issue transfer tickets free of charge to all passengers requesting the same who boarded its cars at any point upon its line within the limits of the city of South Bend, and whose destination might be upon any point upon any other line of appellant within the said city limits; such transfer tickets to be valid only upon the next car leaving upon the line indicated thereon after the issuing of the same."

The limits of the city being thereafter extended, it was contended that the company was not bound to issue transfers except to such passengers as initiated their right within the boundaries of the city as they existed at the time of the franchise. The court held:

"It is apparently insisted by counsel for appellant that the city of South Bend, by annexing the part of the territory in which appellant, under the grant from the board of commissioners, had previously operated its road, abrogated and destroyed its rights acquired by said grant, and therefore violated our fundamental laws. But whatever rights appellant had in said territory under its grant from the board of commissioners were not impaired or destroyed by the extension of the city boundary in question, but were changed by its agreement with the city to issue transfer tickets over its lines therein to all points within the city limits. Whatever rights it had to decline or refuse to issue transfers to persons carried over its road in said territory were merged in and controlled by the contract which it subsequently made with the city. If

appellant desired to stand upon and avail itself of the rights which it had acquired in the territory in question, it ought not to have entered into the agreement and contract with the city in regard to the rate of fare and the right of passengers to transfer. The regulation of the question of fare and the transfer tickets to be issued rests upon the contract in this case between appellant and the city of South Bend. It bound itself thereby not to exact of passengers transported over its lines within the city more than the maximum fare, and to issue, upon request, to such passengers, transfer tickets as provided. This agreement as we have seen, cannot be held to apply only to passengers who are transported on appellant's cars within the old limits of the city, but must be held to apply to and include any and all passengers whose destination is within the limits of the city as they were extended by the annexation of the territory in controversy. This extension, as we have said, by the municipal authorities was the exercise of governmental powers. In a legal sense the city is a unit, although its boundaries may be changed from time to time by extension, and all persons within the limits thereof as extended become bound by, and must yield obedience to, its ordinances. It certainly in reason cannot be asserted that an ordinance adopted by a city must, in its operation, forever be confined to the limits of the municipality as they were at the time it was passed, and cannot become operative in territory thereafter annexed and made a part of the corporation."

In *People v. Detroit United R. Co.* (Mich.), 125 N. W. 700, it was held on the principle announced in the *Hoffman* case, that notwithstanding a franchise to build and operate within the city limits had been granted, a road running beyond the city limits, and acquired by purchase and over which the limits of the city had thereafter been extended, came within the terms of the company's contract to carry passengers at a fixed rate, and that an increased fare could not be exacted. The court said:

"We think it not unreasonable to hold that this mutual contract was made in view of the power of the legislature of the state to increase or diminish the territory within the city,

and that neither the city nor the company contemplated that in case of an extension of the lines of the company within the city, either by purchase or acquisition from another company, an increased fare should be demanded."

The spirit of the contract—and we do not have to repudiate any of its words to so hold—was to insure a fixed fare within the limits of the city of Tacoma at all times; for we cannot assume, in the absence of controlling words, that either the railway company or the city intended to settle merely existing disputes and leave the way open for a continual recurrence of the same troubles; for it is within the knowledge of all men that the municipalities of this state are growing rapidly, and the same difficulties would necessarily and within a short time beset the participants. It was a contract for continuing peace. As was said in *Truesdale v. Newport*, 28 Ky. Law 840, 90 S. W. 589:

"The contract is to supply the city of Newport and its inhabitants with gas. The limits of the city year by year determine the limits of the contract."

In *People ex rel. Chicago v. Chicago Tel. Co.*, 220 Ill. 238, 77 N. E. 245, it is said:

"The words of the ordinance are clear and not ambiguous, and apply to all the territory within the city of Chicago during the period of the grant. The ordinance having been accepted by the defendant became a contract by which both parties were bound, and the territory which has since been annexed to the city is within the city of Chicago. If there had been an intention to restrict the limitations to the existing city limits, such an intention would naturally have been expressed in the ordinance or the acceptance."

It will be seen under this authority that, if we found the contract to be doubtful, it would be our duty to resolve it in favor of the city, for franchises are to be construed in favor of the public, unless controlled by law or the saving clauses of the contract. McQuillan, Municipal Ordinances, § 578; 9 Cyc. 588. It is unnecessary to quote from other cases. The

principle we have adopted is sustained by the following cases: *Des Moines Waterworks Co. v. Des Moines*, 95 Iowa 348, 64 N. W. 269; *St. Louis etc. R. Co. v. Houck*, 120 Mo. App. 634, 97 S. W. 963; *Illinois Cent. R. Co. v. Chicago*, 176 U. S. 646.

As against this array of authority, appellant cites and relies upon the case of *Turners Falls Fire Dist. v. Millers Falls Water Supply Dist.*, 189 Mass. 263, 75 N. E. 630. It may be that this case sustains the contention of appellant, but no authority is cited outside of the supreme court of Massachusetts. It is opposed to our notion of the law, and we are not willing to follow it. The case of *Chope v. Detroit & Howell Plank Road Co.*, 37 Mich. 195, 26 Am. Rep. 512, is also relied upon. We believe this case to be controlled, if not positively overruled, by the later case of *People v. Detroit United R. Co.*, from which we have quoted. Counsel for appellant seeks to distinguish the Michigan cases, asserting that the court in the later case erroneously assumed as a matter of fact that the boundary of the grant moved with the city limits as they changed from time to time. If this were an assumption of fact, counsel's theory would be correct, but we conceive it to be a legal conclusion. At any rate, we so held in the case of *Seattle Lighting Co. v. Seattle*. The case of *Toronto R. Co. v. Toronto*, 37 Can. Sup. Ct. 430, 5 Can. R. Cases, 250, is also relied upon. The facts of this case distinguish it from the case at bar.

It is also contended that, to compel the company to accept a five-cent fare over its present line, would violate the right secured by the company under its contract, thus bringing the case within the contract clause of the Federal constitution. Upon this point appellant cites *Minneapolis v. Minneapolis St. R. Co.*, 215 U. S. 417. In that case the city undertook to compel the company to sell six tickets for twenty-five cents, whereas, the franchise granted a right to charge a five-cent fare. The court properly held that the right to

charge the fare provided in the franchise was of the essence of the contract, and that it could not be abridged by the city. No question of extension of city limits was involved, hence we conclude that the case is not here controlling.

This case depends upon the contract settling disputes, and the legal effect of the words:

"On and after the first day of April, 1903, the said party of the first part shall transport any person from any point or place within the corporate limits of the city of Tacoma, on any line or lines of street railway owned, operated or controlled by said party of the first part, to the terminus of its line in Point Defiance Park, for a single fare not exceeding five cents."

Some point is made by respondent of contemporaneous construction, or acquiescence in the contract as construed by the city. Being satisfied that the contract is broad enough to cover the position of the city, we shall not pursue this contention, except to say that, were we doubtful as to the law, it might be invoked to aid an interpretation of the contract.

It is strenuously contended that the construction we have put upon the contract would work an unwarranted hardship on the railway company, if, for instance, the boundaries of the city were so extended as to meet the boundaries of the city of Seattle. That is a condition that is not before us. We can only assume that, before the railway company extends its line to an unreasonable distance from the business centers of the city, it will enter into a contract with reference thereto, and take a franchise under such terms as may be satisfactory to it. Here we have an existing track over which cars have been and are being run without interruption and as a part of the city system. A trip initiated in one city and ending in another could not be held to be within the terms of a city franchise. Such roads are held to be interurban, and subject to other regulations. Furthermore, we are of the opinion that the right of the county to control the operation of appellant's Fern Hill line died with annexation,

and the right to operate must be held to be amenable to the will of the constituted authorities of the city of Tacoma.

The judgment of the lower court is affirmed.

RUDKIN, C. J., DUNBAR, CROW, and MORRIS, JJ., concur.