CITY OF DETROIT v. DETROIT UNITED RAILWAY.[1]

1. STREET RAILWAYS—MUNICIPAL CORPORATIONS—FARES—FRANCHISES—EXTENSION OF CITY LIMITS.

Where respondent had franchises from the city of Detroit and from adjacent townships permitting it to charge five-cent fares in the city and the same amount over lines in the townships, a temporary agreement made after the city limits had been extended so as to include the township lines within the city, whereby both parties agreed upon the terms under which respondent could continue its operations pending judicial proceedings, and containing the words "under the same terms and conditions now prevailing in the city," etc., was not conclusive of the rights of either party and the fact that respondent was collecting the disputed fares in both city and township when a *modus operandi* was agreed upon between the parties could not aid in construing its rights under franchises in question.

2. SAME.

The franchise of the railway company in the city is to be construed with reference to the power of the legislature to extend the limits of the municipality, and construing it strictly as against the grantee, under the general rule of construc-

---

[1] Removed by writ of error to Supreme Court of the United States, January 3, 1913.

tion, the railway company is required to charge the rate of fare specified in its franchise throughout the city as enlarged.

3. SAME—CONSTRUCTION OF FRANCHISE.
 Nor did provisions in the franchise limiting the time in which certain lines should be completed, or restrictions as to streets, control the interpretation of the grant.

4. SAME—CONSTITUTIONAL LAW.
 While respondent may have obtained by purchase all the rights owned by the corporations operating in the township, and such rights cannot be abridged by legislative action, the railway company under its franchise had by agreement placed itself in such a position that it could not enforce the rights against the other party to the contract.

Certiorari to Wayne; Hosmer, J. Submitted October 15, 1912. (Calendar No. 25,260.) Decided December 17, 1912.

Mandamus by the city of Detroit against the Detroit United Railway to compel respondent to accept passengers at certain rates and to reduce fares on certain portions of its lines. An order issuing the writ is reviewed by respondent on writ of certiorari. Affirmed.

*Brennan, Donnelly & Van De Mark (John C. Donnelly, Fred A. Baker,* and *Hinton E. Spalding,* of counsel), for appellant.

*Richard I. Lawson (P. J. M. Hally,* of counsel), for appellee.

STEERE, J. This is a proceeding in certiorari, instituted to review the action of Wayne county circuit court in granting a writ of mandamus, at the instance of the city of Detroit, requiring the Detroit United Railway to carry passengers for a single five cent fare at all times of the day, and during workingmen's ticket hours for a single ticket, between the easterly limits of said city, near the so-called Alter Road on Jefferson avenue, and the opposite northwesterly city limits on Grand River avenue; it being claimed by relator that respondent is obligated so

to do under the provisions of certain ordinances. The case was heard upon petition and answer, and the material facts are practically undisputed.

A very clear and satisfactory statement of the case is found in the opinion of the trial judge which, supplemented by some additions from the briefs of counsel for respondent, we follow closely.

Respondent's cars are operated between the points above mentioned connectedly, as a single line. The petition claims that extra fares or tickets are required of passengers when traveling on Grand River avenue between the present northwesterly city limits, which are about a mile beyond the city boulevard, and the old city limits, which were near the boulevard, and that a like extra charge is made for travel on Jefferson avenue between St. Jean avenue and said Alter Road. It appears from respondent's answer, and is undisputed, that, although asserting a right to exact fare beyond the city boulevard on Grand River avenue, respondent does not do so; and that, still asserting its legal right to the extra fare, it is not collecting extra fares or extra tickets for travel on Jefferson avenue between St. Jean avenue and the Alter Road during workingmen's ticket hours, but it admits that it does collect such fares for travel between those limits at other times. The tracks of respondent on Grand River and Jefferson avenues are connected and operated together, cars passing from one to the other through Griswold street; the route formerly having been through Woodward avenue, but later changed for the convenience of respondent and its patrons, and not in compliance with any obligation imposed upon it by ordinance or contract. Respondent is a corporation owning and controlling the electric railway lines in and adjacent to the city of Detroit having, as its name indicates, acquired and united into one organization various independent lines which had been incorporated and built from time to time under different franchises and operated independently throughout the city and its suburbs.

Respondent derives its right to operate in the city of Detroit through grants acquired from lines previously organized and subsequent ordinances and resolutions of the common council of the city as follows:

By an ordinance of May 1, 1868, the city of Detroit granted to a corporation known as the Grand River Street Railway Company the right to construct a line on certain streets, including Grand River avenue, to the intersection of the Michigan Southern Railway, the tracks of which were near the city boundary; and by section 3 of said ordinance gave the right to build a second track within five years after the first track was completed. By section 6 of said ordinance "the rate of fare for any distance is not to exceed five cents in any one car or any one route named in this ordinance." By section 8 the line on the Grand River avenue was to be completed to the easterly line of Woodbridge farm contemporaneously with the paving of the street, and from said farm line to the west line of the city limits whenever public necessity, as it might be determined by the common council, should demand.

An ordinance dated August 3, 1888, granted to said company the right to construct a single track on Grand River avenue from its then present terminus to the westerly city limits. Section 2 of said ordinance required that such extension should be completed before the street should be paved, under proceedings then pending before the common council, in default whereof said right should be forfeited.

An ordinance dated January 3, 1889, granted to said company the right to lay a double track through Grand River avenue from Woodward avenue to the city limits. This grant was made subject to the provisions of the grant of 1868, heretofore first mentioned. Section 4 of the latter ordinance provided that "the lines hereinbefore authorized shall be constructed and in operation within one year from the date of the passage of this ordinance. Section 3 required said company to stipulate to carry passengers for a five-cent fare from the westerly terminus of the

Grand River avenue line to any point on Congress street east, and vice versa; also from any point on the line of said railway to any other point, and to sell tickets at eight for a quarter good over the entire route of said company or any portion thereof, either way, within certain hours. At the time of the adoption of this ordinance of 1889, the westerly city limits were located just beyond the city boulevard, and the company extended its tracks to that point under said ordinance. Beyond the city limits, and on either side of Grand River avenue extended (called the Grand River Road), lay the township of Greenfield. This township in 1897 gave a franchise to the Grand River Electric Railway for extension of a line across the township, along said road "to the present city limits of Detroit," fixing the rate of fare at five cents, or six tickets for a quarter, with school tickets at ten for thirty cents, for any distance within said township. This line was built accordingly, connecting at the city limits with the city line near the boulevard; the incorporators bonding the road for $850,000. This amount is still outstanding.

By legislative acts of 1905 and 1907 the city limits were extended northwesterly on Grand River avenue, or road, for about one-half mile. Previous to this time respondent had become the owner of the city line on Grand River avenue in the city and also the connecting line extending through the township of Greenfield along the Grand River Road.

In November, 1862, the city by ordinance granted to a corporation known as the Detroit City Railway the right to construct lines on certain streets in said city, including Jefferson avenue. The routes of all such lines were to commence on Woodward avenue and run on their several courses to the city limits; the time for completing these various lines being fixed. The route along Jefferson avenue to the city limits was to be completed within six months after March 31, 1863. A deposit was required to be made as security for the completion of certain of the lines, to be forfeited on failure. It was also provided that

the rate of fare should not exceed five cents on any car or on any route named in the ordinance. In 1873 a section added to this ordinance authorized the construction of a second track along Jefferson avenue. In 1879, by ordinance, the rights and obligations under the ordinance of 1862 and amendments thereof were "extended and limited to 30 years from this date." In 1889 a supplemental ordinance granted to the Detroit City Railway the right, among other things, to extend a double track along Jefferson avenue from its then easterly terminus to the easterly city limits, fixing the time within which the same should be constructed; it being also provided that the additional lines should be operated as a part of the existing system of the Detroit City Railways, provided the company should agree in writing to carry passengers over certain lines to other points on specified lines for a single five-cent fare, and also to make arrangements for carrying passengers within specified hours over any of its lines within the city limits for a single fare, or on an eight for a quarter ticket with specified transfer rights.

In 1862 the city limits of Detroit on Jefferson avenue were at Mt. Elliott avenue. In 1885 they were extended to a point 200 feet east of Baldwin avenue, and so continued until said ordinance of 1889 was enacted. In 1891 the limits were extended to Hurlbut avenue, which was the easterly line of the township of Hamtramck. Previous to this time a route had been constructed on Jefferson avenue in Hamtramck township by the Hamtramck Street Railway Company, or by the Jefferson Avenue Railway, under grants providing that the city fare should include transportation in the township and vice versa. From Hurlbut avenue easterly to the Country Club in the township of Grosse Pointe, a line was constructed under a grant made by the township, or village, of Grosse Pointe to the village of Fairview. This line was purchased by respondent prior to an act passed in 1907, by which the territory from Hurlbut avenue east to a point near the Alter Road in the village of Fairview became a part of

the city. These village and township grants contained provisions for an extra fare.

Prior to 1909 respondent had absorbed the various lines organized and constructed under the foregoing franchises and ordinances, by purchase, in accordance with the provisions of section 6448, 2 Comp. Laws,[1] and acquired the rights conferred by such grants, including authority to collect fares "in the same manner and upon the same terms" as the original organizations.

A question having arisen between the city and respondent as to the latter's franchise rights being about to expire on certain streets, including a portion of Jefferson avenue, the matter was temporarily adjusted by an arrangement under which the common council of the city passed a resolution on October 26, 1909, granting respondent permission to continue operations after November 14, 1909, from day to day, "under the same terms and conditions, except as to percentages on gross receipts now prevailing in the city of Detroit whether due to contract agreement or not." The conditions of this resolution were accepted by the respondent with the statement that it did not waive, and conceded that the city of Detroit did not waive, any rights. At the time of this arrangement respondent was collecting the fares in controversy in this cause.

The question presented for determination is whether or not, outside of workingmen's ticket hours, the rights to charge extra fares acquired by respondent under the Greenfield and Grosse Pointe grants are abrogated within existing city limits by the foregoing arrangement of 1909, construed with the original city ordinances of 1862 and 1868, fixing the rate of fare within the city limits, and the two city ordinances of 1889 relative to the Grand River Street Railway Company and the Detroit City Railway Company. Apparently the parties hereto do not disagree as to their respective rights relative to rates of fare inside of or beyond the city limits, had those limits remained un-

[1] This section as amended in 1905 is found in 3 How. Stat. (2d Ed.) § 6997.

changed.    The real contention arises over the effect of extending the city boundaries.

The subsequent agreement of 1909 was manifestly a temporary provision for a *modus operandi* from day to day, not intended as a final adjustment of any of their serious differences, and gives little aid in the solution of this problem.   By it relator permitted respondent, on payment of a certain *per diem,* to continue operations "under the same terms and conditions, except as to percentages on gross receipts, now prevailing, in the city of Detroit, whether due to contract agreement or not," and the proposition was accepted with the understanding, as declared by respondent, that neither party waived any of its rights, whatever they might be.

Relator contends that one of its rights, reserved and imposed by the terms and conditions of the various ordinances, franchises, and legislation heretofore referred to, gave to any passenger, upon payment of a five-cent fare, the privilege of a continuous ride, within the city limits, from any point on the lines of respondent's railway to any other point on any of said lines; that the combined provisions relating to continuous rides, in the various grants which respondent had united, comprehended all territory within the limits of the city of Detroit, whenever and wherever located, and went with any extension of the municipal boundaries, or of respondent's lines, within said boundaries.

Respondent contends that a proper construction of said grants restricts the five-cent fare rate to the city limits, and lines constructed, as they existed when the grants were made; and urges that its position is strengthened by the arrangement of 1909, for the reason that relator knew the railway company was then regularly collecting the fares now objected to and sanctioned the same as a part of the "prevailing terms and conditions" recognized and reserved by the agreement.

We are unable to adopt that view of the significance of

173 MICH.—21.

the agreement. The word "prevailing" has no technical legal import. In the connection used it simply signifies that which is common, in operation or prevalent, while "terms" and "conditions" often used synonymously, when relating to legal rights, are technical words of well-defined legal meaning. As used in contracts generally, they mean the propositions, limitations, and exactions which comprise in whole or in part the agreement and govern the contracting parties, defining what they obligate themselves to do or not to do. As applied to a statute or ordinance giving a charter or franchise, they signify the boundary, limit, or extent of the grant. *Railway Co.* v. *City of Cincinnati*, 1 Ohio Prob. R. 269-278. The act, or fact that respondent was collecting the disputed fares, when a *status quo* from day to day was agreed upon, could not be construed as a part of the "prevailing terms and conditions" mentioned in the agreement.

Counsel for relator broadly contend that the effect of any change in a municipal boundary is no longer an open question in this State, but that it was put to rest by the decision of this court in *People* v. *Railway*, 162 Mich. 460 (125 N. W. 700, 127 N. W. 748, 139 Am. St. Rep. 582).

Strong language of general application is there found. The direct question in that case was whether the requirements of paragraph "d," section 4, of the ordinance of 1889, which ordinance is also here involved, compelling the respondent to carry passengers during workingmen's ticket hours "over any of its lines in said city for a single fare," bound it to transport passengers to the easterly limits of Jefferson avenue, as extended subsequent to the adoption of said ordinance, notwithstanding the company was assignee of the earlier franchises granted by Grosse Pointe township and the village of Fairview. In the original opinion handed down in that case this court, speaking through Justice MONTGOMERY, said:

" We think it not unreasonable to hold that this mutual contract was made in view of the power of the legislature of the State to increase or diminish the territory within the city, and that neither the city nor the company contemplated that in case of an extension of the lines of the company within the city, either by purchase or acquisition from another company, an increased fare should be demanded "— citing and reviewing *Township of West Bloomfield* v. *Railway*, 146 Mich. 198 (109 N. W. 258, 117 Am. St. Rep. 628), and *Indiana R. Co.* v. *Hoffman*, 161 Ind. 593 (69 N. E. 399).

The opinion concluded as follows:

"We construe the ordinance to include any street railway constructed or purchased by the defendant which shall be within the city of Detroit as the limits of said city may from time to time be fixed by the legislature."

On a rehearing granted in the case the court declined to modify or recede from those views, and, in a supplemental opinion by Justice STONE, said:

"A further investigation of the questions involved satisfies us of the correctness of the reasoning and conclusion of Chief Justice MONTGOMERY who wrote the former opinion in these cases (*ante*, 461 [162 Mich. 461, 125 N. W. 700, 127 N. W. 748, 139 Am. St. Rep. 582]), to which opinion reference is here made. He cited and followed the case of *Indiana R. Co.* v. *Hoffman*, 161 Ind. 593 [69 N. E. 399], decided by the Supreme Court of Indiana. That case is well reasoned, and is supported by the authorities therein cited, and we think it should be followed in these cases. It may be asserted as a general proposition, applicable here, that a municipal law or ordinance designed for a city at large operates throughout its actual boundaries, whatever they are, and is not affected by the fact that these are enlarged from time to time "—

concluding with approval of the rule that the terms of a franchise, or grant, by a municipality, shall be construed strictly as against the grantee and as favorably to the grantor as its terms permit.

It is claimed in behalf of respondent that this case is not controlling; that the language then under consideration, relative to the fares, was different from that now before

us; that the general rule announced by the court was not necessary to a disposition of the issue and is largely dictum; that the court did not have before it section 2 of the ordinance, which limits the time for construction of tracks authorized, indicating that the ordinance could not apply to tracks thereafter constructed, or, by extension of boundary, subsequently brought within the city limits; and that all the ordinances now before us, granting franchises on Jefferson and Grand River avenues, as well as other streets, required the lines to be built within a definite time, performance being insured by provisions for a bond or a forfeiture.

It is true that the case at bar and *People* v. *Railway, supra,* have distinguishing features; and it is possible the latter case might have been disposed of on other and narrower grounds, but those which the court announced were pertinent, were not dictum, were directly in line with the points made and questions presented, and asked to be determined, by counsel for the respective parties, as appears by their briefs. The then counsel for respondent contended that—

"There is nothing in the street railway act nor in the contracts contained in any of the ordinances or grants mentioned from which it can be asserted that, as often as the State should change the boundaries, the contracts would be correspondingly annihilated or altered, or the contracts of one municipality substituted, in whole or in part, for that of the other."

On the other hand, counsel for the city contended that in making these contracts—

"It is to be presumed that the power of the legislature of the State was borne in mind, the power of increasing or diminishing territory from the given city, town, or village; when, within that ordinance, the words 'city limits' were used, it was meant not only the city limits, as then established, but the city limits as they might be in the future."

Authorities in support of both contentions were cited in that case and are cited here.

We think it can be said with certainty that, in a case where the question was pertinent and squarely presented in the briefs of counsel on both sides, argued and reargued, this court, in harmony with *Indiana R. Co.* v. *Hoffman, supra* (161 Ind. 593 [69 N. E. 399]), and the authorities there citied, now supported by the more recent case of *Peterson* v. *Power Co.*, 60 Wash. 406 (111 Pac. 338, 140 Am. St. Rep. 936), has unequivocally declared it a general rule in this State that city ordinances, designed for the city at large, operate throughout its boundaries, whatever changes may be made in them, and that grants by such ordinances, though accepted and amounting to contracts, are to be construed as made and accepted in contemplation of, and subject to, such rules, unless the contrary is clearly expressed.

It is further urged in behalf of respondent that, conceding such general rule of construction, the contrary intent appears in this case from the language of the grants limiting the time of construction, together with the streets on which and points to where the lines might be built; referring specifically to city limits as they then existed, thus negativing future extensions. Counsel say in their brief:

" It is contrary to all reason to believe that in 1862 or 1868, or 1889, the city of Detroit made a grant fixing the rate of fare in territory which did not become a part of the city until 1907. Such a grant by implication is contrary to the fundamental principles of the construction of municipal grants "—citing cases.

We think the language already quoted from *People* v. *Railway, supra*, intimates that some such belief might be entertained. Certain of the language used in the ordinances points to such a possibility and intimates an understanding that a growth of the city and development of its public utilities, to which the grants should apply, were anticipated.

In the original ordinance of 1862, to the Detroit City Railway, it was exclusively authorized to construct and operate lines—

"On and through Jefferson, Michigan and Woodward avenues, Witherell, Gratiot, Grand River and Brush or Beaubien streets, to Atwater street; and from Jefferson avenue at its intersection with Woodbridge street, to Third street; up Third street to Fort street and through Fort street to the western limits of the city; and through such other streets and avenues in said city as may, from time to time, be fixed and determined by vote of the common council of the said city of Detroit, and assented to, in writing, by said corporation."

Provision was also made for connecting these various lines with Woodward avenue in such manner that each will furnish a continuous route through the heart of the city to and along Jefferson avenue. It was also provided that the railway down Gratiot street, or through Randolph street, Monroe avenue, and the Campus Martius may be continued as grantees may elect. The ordinance of 1868 to the Grand River Street Railway company contemplated extension of lines on other streets than those named, double tracking, etc., looking forward to development and expansion.

We do not regard the restrictions, in the ordinances, as to streets, city limits, and time of construction, as of controlling import. They do not negative the presumption that the parties contracted with the power of the legislature to change the city limits in view. The limit of time for completing the lines on certain streets was but a preliminary condition. The subsequent right and ability to operate the lines and collect fares only became absolute when the lines were constructed and the preliminary condition forever disposed of, and then there was no time limit involved, except the life of the franchises.

It is unquestionably the law, as a general proposition, that in purchasing the Greenfield and Fairview lines respondent acquired all rights originally granted by the franchises for such lines; and it is equally a general rule of law that those rights, once granted and accepted, could not be destroyed or abridged by subsequent general or local legislation. But it does not follow that respondent

might not be in a position when those rights were purchased, by reason of other and previous contract obligations, so that as against certain parties and in certain localities all those rights could not be enjoyed or enforced by it.

The rights of the townships, which granted franchises for the lines respondent purchased, or of citizens of said townships, or of the holders of underlying bonds, or the validity of the franchises, are not involved here. It is only a question of whether respondent has, by contract with the city, obligated itself not to collect more than a five-cent fare in a certain zone where, were it not for such contract, it would be authorized so to do under said township franchises.

The court, in *People* v. *Railway, supra,* said of the ordinance of 1887 as an entirety that it should be construed as a mutual contract, made in view of and subject to the power of the legislature to change the city boundaries; the contracting parties being held to contemplate that an increased fare should not be demanded in case of an extension of the lines of the company within the city, either by purchase or acquisition from another company.

We do not think such construction is or should be limited to a single paragraph of the ordinance. It can with equal force be said of other parts of that ordinance, and of the others under consideration, that they are contracts to be construed as made in view of and contemplating expansion, and extension of application to territory which may by legislation be added to the city.

That contract and previous contracts, embodied in ordinances to which it is supplemental, define respondent's right of existence in the city of Detroit. Its primary rights in the city territory are by city grant. It has united, built up, and developed as an entirety a street railway system within the city, extending to and beyond its limits. It has absorbed by purchase and made a part of that system the township lines in question with their grants, and as a result of such unification and practical combination, even though in name and form it may re-

tain the original corporate organization of the subsidiary companies, it has made them, as to the city and within the city, an integral part of the whole, and subjected them to the restrictions contracted for in the original city ordinances, thus defining and limiting its own rights under the township grants, within city territory, as subordinate to and dominated by said city ordinances.

We are of opinion that the conclusions arrived at by the court below are correct, and its judgment is therefore affirmed.

MOORE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.